**UNITED STATES v. NORTHERN PAC. RY. CO.**

**NORTHERN PAC. RY. CO. v. UNITED STATES.**

Nos. 13895, 13896.

United States Court of Appeals
Eighth Circuit.

March 22, 1951.

M. L. Countryman, Jr., St. Paul, Minn., for Northern Pac. Ry. Co.

C. U. Landrum, U. S. Atty., St. Paul, Minn., Spencer L. Baird, Regional Counsel, Bureau of Reclamation, Amarillo, Tex., and A. B. Rood, Attorney, Department of Justice, Washington, D. C., for the United States.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This action was brought in the United States District Court of Minnesota by the Northern Pacific Railway Company against the United States of America under 28 U.S.C.A. § 41 (20), now 28 U.S.C.A. § 1346 (2), to recover a balance claimed to be due the railroad for freight charges on six shipments of cement from six points in the State of Washington to Odair, Washington, from which point the cement was transported over a government-owned railroad to the site of the Grand Coulee dam, where it was used in the construction of the dam. Northern Pacific claimed that the amount.

which should have been paid for the shipments involved in its action was the regular tariff rate, less the applicable land-grant deductions; while the government claimed the rates applicable to the shipments in question were lower rates granted by the Company to the Government pursuant to a special contract entered into between the Railway Company and the government under the Interstate Commerce Act, 49 U.S. C.A. § 22. The total amount claimed by the Northern Pacific to be due on the six shipments was $1,645.19. Adjudication of government liability for that amount, however, would establish its obligation for similar claims of the Company amounting to some $2,000,000. The government denied liability as charged and filed eight counterclaims against the plaintiff in the amount of approximately $5,500,000. On the trial of the case to the court without a jury, the court entered judgment dismissing the action of the railroad and dismissing the counterclaims of the government. Each of the parties appeal.

The facts, including controlling provisions of the contract involved and documentary evidence, are set out at length in the opinion of the District Court at 70 F. Supp. 836, but are epitomized for the purpose of this opinion as follows: In 1933 the United States government set out to build a dam and power plant at Grand Coulee, Washington. The initial appropriation voted by Congress was $63,000,000. Limited by this amount, government engineers knew that it would not be possible to build a dam large enough to fulfill all the requirements of a proper dam for the location. Accordingly, plans were drawn for a dam which could later be expanded into a larger dam. This "low" dam would provide electric current, but would not be large enough to provide any irrigation for the area. The fact that no irrigation would be provided made the "low" dam unsatisfactory to everyone concerned, but it was decided that nothing else could be done at the time.

On July 16, 1934, a contract was entered into between the government and the Silas Mason Company, Walsh Construction Company, and the Atkinson-Kier Company for "construction of Grand Coulee Dam and Power Plant, as covered by Items 1 to 85, inclusive, of the Schedule of Specifications No. 570. * * *" Specification No. 570 provided for a low dam which would provide hydro-electric power. Construction was started under this contract, but continuing discussions were held concerning the advisibility of building a "high" dam. Finally on June 5, 1935, by "Order for Changes No. 1" (which changes were authorized by the contract of July 16, 1934, between the government and the Mason-Walsh-Atkinson Companies) the design was changed, and the structure which was built was a foundation structure adapted to economical construction of the "high" dam upon it. Subsequently, the Mason-Walsh-Atkinson contract was terminated by "Change Order No. 2" on March 21, 1938, by which time further funds had been appropriated by Congress and the work proceeded to completion of the "high" dam under a contract dated February 7, 1938, between the government and Consolidated Builders, Inc.

Solution of the transportation problem was of course one of the first tasks of the government. After much discussion of various means, methods, and routes of transportation, the government decided that the best solution was to build a branch line railroad itself and to enter into a contract under the Interstate Commerce Act, 49 U. S.C.A. § 22, with the Northern Pacific Railway Company for the transportation of cement and other materials. After many negotiations, a preliminary draft of a contract was drawn which the Railway Company found acceptable on August 10, 1934, and which the government approved on November 12, 1934. Further revision was then asked by the Company, and finally a contract was drawn acceptable to both parties. This formal contract was dated November 19, 1934, but was actually signed by the Company on March 4, 1935, and by the government on July 17, 1935. By the terms of this contract, the government was to build a railroad from Odair, Washington, to the site of the dam, and the Company was to transport cement and other materials at specified rates.

In this contract, Section 12 provided: "The following maximum rates, in cents per hundredweight, are hereby established by the Company on cement moving over existing rail routes in cars loaded to maximum capacity from certain points, as herein listed, in the State of Washington to Odair, Washington, on Government bills-of-lading, for use in the construction of the Grand Coulee dam and power plant: * *."

The suit of the railroad was based on the claim that said contract was not applicable to the shipments of cement involved in the action because those shipments were used in construction of the "high" dam that was actually constructed. It alleged that the contract between Northern Pacific and the government (including Section 12 above) provided a contract rate only for the transportation of cement required for a so-called "low" dam, as proposed in the contract of July 16, 1934, between the government and the Mason-Walsh-Atkinson Companies. The government on the other hand contended that the contract entered into with Northern Pacific provided for the transportation of all the cement needed for building the Grand Coulee dam and power plant in its finished form, or in other words, the "high" dam as completed under the contract between the government and Consolidated Builders, Inc. The trial court's ruling and judgment sustained the government's contention and we consider first the appeal of the Railway Company asserting error in the judgment dismissing the railroad's action.

It is evident from the record that the dispute in that action turns upon the meaning to be ascribed to the words "Grand Coulee dam and power plant" as used in the contract. Both parties contended, and contend here, that the entire contract is not ambiguous, but each party claims the phrase used in the contract means a different thing. The trial court recognized that "Grand Coulee dam and power plant" had a very definite meaning as generally used, but in view of the varying constructions contended for, the court heard extrinsic evidence to explain the term in dispute as used in the contract.

On consideration of the extrinsic evidence adduced before it, the trial court held that the contract was ambiguous, and that it should be judicially construed. The question as to whether an ambiguity exists in a contract is to be determined by the court as a matter of law. 17 C.J.S., Contracts § 617; Whiting Stoker Company v. Chicago Stoker Company, 7 Cir., 171 F.2d 248; Golden Gate Bridge & Highway District of California v. United States, 9 Cir., 125 F.2d 872. The phrase in question would ordinarily have only one definite meaning—that contended for by the government. However, in view of all the facts—the manner in which the construction contracts were awarded by the government, the supplementing of the first contract by another, the long course of negotiations between the railroad company and the government concerning transportation—the court logically concluded that the attendant circumstances gave rise to such indefiniteness of designation of the project as to render the contract ambiguous.

When it is once established that the contract is ambiguous then the meaning of its terms is a matter of fact to be determined in the same manner as other questions of fact. Floyd v. Ring Construction Corporation, 8 Cir., 165 F.2d 125, 129, and cases there cited. In the present case, the court, having properly determined that the contract was ambiguous, heard extrinsic evidence for the purpose of clarifying the uncertain term. After considering this evidence the trial court found that "when the contract was executed by the plaintiff in March and the defendant in July, 1935, with full knowledge that the high dam was then being constructed, manifestly both parties accepted Grand Coulee dam and power plant to mean the high dam."

This finding of fact is amply supported by the evidence and must be sustained in this court on this review. The court's finding that at the time of making the contract the parties intended to cover and fix a rate for transportation of cement for the entire construction designated "Grand Coulee dam and power plant", i.e. the "high" dam, is conclusive of the dispute as to the rate applicable to the shipments included in

the railroad's action. It precluded recovery by the Company in the action. We think the provisions of Section 20 and Section 12 of the contract as construed by the trial court present no such conflict as to require a contrary conclusion. The trial court's ruling to that effect was without error.

The appeal by the railroad presents no error in the judgment dismissing its case and that part of the judgment is affirmed.

## II.

We turn to the government's appeal from the part of the judgment which dismisses the government's counterclaims.

The counterclaims of the government against the railroad were based on allegations that the Company induced the government to execute the contract fixing excessively high and unjust transportation rates on cement and materials for the Grand Coulee dam and power plant by means of fraud and deceit.

In order to defeat the claim asserted by the railroad to the effect that no valid contract between the parties fixed rates for the transportation for which the railroad sued, and that the regular tariff rates with land grant deductions controlled, the government had insisted that the contract fixed the rates and that the contract was controlling and valid. The court, as stated, found the contract to be subsisting throughout the work of construction, applicable to shipments for use in the construction, and valid, and therefore it dismissed the plaintiff's action.

But in its counterclaim the government took the position that when the Northern Pacific first sought the business of transporting the cement and materials for the Grand Coulee project the only line which the Company had available from the west coast to Odair, Washington, was a long, circuitous route covering an average of 440 miles from the six cities named in the contract to Odair. See map in the opinion of the District Court at 70 F.Supp. 844. Other railroads, especially the Great Northern, had more direct routes which would serve the same places from the coast to within a short distance of the dam site at an average haul of 235 miles. In order for these other lines to be utilized in getting supplies to Odair, and thence to Grand Coulee, they would have to go into the city of Adrian, Washington, from the west over their own lines and thence north to Odair (a distance of about 21 miles) over the line of Northern Pacific. The government alleged that the Company representatives told the government representatives that Adrian could not be "opened up" to the other railroads, and that if the Northern Pacific got the hauling contract, the cement and materials would have to be hauled over the long circuitous line of that Company. As a matter of fact, after Northern Pacific had been awarded the contract, an agreement was entered into between Great Northern and Northern Pacific and the cement was actually transported over the shorter lines through Adrian. The government contended that the Company knew at all times that this shorter route would be employed, but that the Company made the representations that the longer route would have to be used in order to obtain an excessively high and unjust contract rate from the government.

The government also claimed that the representatives of the railroad had figured out and knew the correct land grant deductions applicable to the regular tariff rates on the cement shipments but that the government representatives had mistakenly figured the deductions too low. That the railroad representatives purposely and wrongfully failed to disclose the mistake of the government agents in this matter.

Although the trial court found that the government agents had made a mistake in their computations of the land-grant deductions, it was clear that the contract rates were not related in any way to the deduction figures, and the mistake as to such figures in no wise affected the validity and binding effect of the contract.

The government contended that the alleged misrepresentations and alleged wrongful failure to disclose constituted fraud. It contended that on account of such fraud the court should order a reduction in the contract rate proportionate with the difference between the length of haul which plaintiff's agent represented would

have to be made and the length of haul as it actually was. The Grand Coulee project was almost completed when the counterclaims were set up and the freight charges had been paid in accordance with the contract through the years of construction. The counterclaims sought a refund of part of the payments made by the government, as well as other specified items of alleged damage.

The evidence as to the conferences, correspondence, and circumstances connected with the negotiations for, the formulation, agreement upon, and execution of the contract in this case was voluminous and was carefully analyzed and considered by the trial court. The court concluded there was nothing to indicate that there were fiduciary relations between the parties to the contract, but on the contrary, the participating agents were intelligent, experienced men of affairs, dealing at arm's length with each other. Each side had much data on all subjects considered, and had means available to inform itself on any matter relevant to the contract. It was not a situation where either party was dependent upon or had a right to rely upon the other party for information as to any material matter. The court did not make a finding sustaining the government's charge that a railroad agent had represented that the materials would have to be hauled over the long route if the contract were made with the plaintiff Northern Pacific. Nor was there evidence to support a finding that the railroad agent referred to (Mr. Clark, officer in charge of traffic) had made any false statements in the negotiations for the rate contract. No "gateway" through Adrian had been opened at the time of the negotiations but it was opened subsequently through contract entered into between the railroads. Such contract was on terms advantageous to the Northern Pacific because that railroad had the contract for the business with the government. The court held specifically that the written contract between the government and Northern Pacific fully and accurately expressed the agreement made by the parties, that fraud was not a basis for any counterclaim by the government, and that the contract was not vitiated by fraud.

It is clear from the record that in the trial court the government took the position that it was entitled to obtain the money judgment against the plaintiff which it sought in its counterclaim on account of the alleged fraud of the railroad either through rescission of the contract that had been entered into and almost entirely executed, or through a reformation thereof, and the court on full consideration concluded none of such remedies was open to the government. We find no error in that conclusion, or the reasoning in support of it, and find no merit in the contentions presented against it here.

But on this appeal it is strenuously urged for the government that the alleged fraud of the Company gave rise to a right of action in the government for damages for deceit, and reversal is sought for the refusal of the trial court to award judgment for the government on that theory. The effort has been to assimilate the government's case here to the situation presented in the old case of United States v. Barlow, 132 U.S. 271, 10 S.Ct. 77, 33 L.Ed. 346. In that case, the United States brought a statutory action against Barlow, a sub-contractor on a mail-hauling contract, for recovery of sums paid Barlow due to a mistake of fact on the part of the government. This mistake of fact was occasioned by the misrepresentation that additional men and horses would be needed if Barlow was to be able to provide speeded-up service over a new mail route. Barlow had calculated the time necessary on the new route on the basis of the extremely slow miles-per-hour rate at which the mail had been carried over the old slow and difficult route. The mistake or misrepresentation that Barlow made was readily apparent, but the government paid him the money demanded for more men and horses for the speedier service. It was admitted that the additional men and horses were never used. The Supreme Court held that the government was entitled to recover the sums paid for the men and horses not used. The argument is that there was a similar situation and a similar right to recovery on the part of the government in the case at bar.

This case is readily distinguishable from the Barlow case. In that case, the amounts paid by the government were determined on the basis of Barlow's costs in performing the work. These costs were misrepresented to be higher than they actually were. But there is no claim here that the rates specified in the contract were related to or made dependent upon costs or disbursements to be incurred by the Northern Pacific. The government agreed to pay the rates and it imposed no restriction upon the Company as to which lines of railroad should be used in the transportation. What was considered and discussed was possible trucking from Great Northern points, possible extension of the government railroad to connect with the Great Northern, the possible construction of a cement mill at the dam site, and precedent established by the Union Pacific's 20¢ rate for a similar haul over a distance comparable with the short haul available in this case in connection with the Boulder Dam project. The evidence shows that the contracts which the Northern Pacific made with the Great Northern and the Milwaukee accorded a large percentage of the proceeds of the hauling to the Northern Pacific in view of the small percentage of the haul actually made on Northern Pacific tracks. On account of that fact the trial court did at one place in its opinion refer to the contract as a "bonanza" for the Northern Pacific. But the contracts the railroads made between themselves are not within the issues of this case. The government entered into the contract freely and voluntarily with means and opportunity to be fully informed at the time and throughout the period of its execution. The trial court made no finding that the contract rate was based on the longer mileage, and an examination of the record shows that no such finding could have been made. The rate finally agreed on in the contract compares favorably with rates contemporaneously allowed the Union Pacific in the Boulder Dam project, and it appears that at the time that was a deciding factor.

It is therefore apparent that the alleged misrepresentations as to the mileage of haul could not afford any basis for an action in tort for deceit. To afford a basis for such an action, the alleged misrepresentation must have been a substantial factor in causing the defrauded party to act to his detriment. It "must have had such relation to the transaction in hand as to operate as an inducement to the action or omission of the complaining party, and it must have been relied on by him." The complaining party "must have used due diligence to discover for himself the truth or falsity of the representation, or the relations of the parties to each other or the location or character of the subject-matter of the transaction must have been such as to excuse investigation and to justify his reliance upon the assertion of the other." Roosevelt v. Missouri State Life Insurance Company, 8 Cir., 78 F.2d 752, 757. The evidence does not bring this case within the applicable principles.

Here, the rates agreed upon and specified in the contract were not related to or based upon the mileage of the haul, but were to be paid without regard to the route or distance of transportation. The railroad was left entirely free to contract with other railroads whose hauls would be shorter and it was within its rights in making such contracts.

It may be stated that the government did not present to the trial court the theory of the case which it has most strenuously contended for here. In the trial court the counterclaims were not presented as actions in tort for damages for deceit. The government did not plead or claim a cause of action for damages in tort for deceit. As stated, it sought recovery by means of an accounting after a reformation, rescission, or modification of the contract; and the grounds for such reformation, rescission, or modification were the alleged misrepresentations of the Company. But we are mindful that "in all dealings with the government, contractors and agents alike are under obligation to deal strictly within the limits of the statutes and with absolute honesty." "* * * the doctrines of fraud, unconscionable dealing and unjust enrichment are to be strictly applied to insure fair and honest dealing between the government and its citizens." Muschany v. United States, 324 U.S. 49, 59, 65 S.Ct. 442, 448, 89 L.Ed.

744. We have therefore considered whether a case was made out for the government on any theory and we hold there was not.

### Freight Other Than Cement.

In the contract here involved, in Section 12 after the provisions for transportation of cement, there was the following further provision: "On the balance of the items of materials, supplies and equipment to be used in the construction of the Grand Coulee dam and power plant and moving on Government bills-of-lading, the established commercial freight rates over existing routes, less land-grant deductions, shall apply, with the following exceptions: * *."

It is the contention of the government that this provision gave the government a special rate for such materials—that is, the rate *then existing,* and not merely the commercial rate which other shippers paid at the time of the particular shipment billed. There were substantial raises in the commercial rates from the time the contract was made to the time of the last shipment made under the contract.

In construing this provision, the trial court held that it merely gave the government the right to ship the other materials and to be billed at the regular tariff rate less the applicable land-grant deduction. With this conclusion we are in accord. It is the contention of the government that if this construction is adopted, the provision in the contract is meaningless. Such is not the case. Immediately preceding this clause is one granting the government a special rate on cement. This clause was then put in to show that the government was not to get a special rate on other materials.

### Cement Shipments From Trident, Montana, and Portland, Oregon—two points not named in the contract.

As the construction work proceeded, the rate of pouring of cement exceeded all expectations. Consequently, it became apparent that the cement mills in the six cities named in the contract could not produce and ship sufficient cement to meet the building contractors' requirements. Negotia-

tions were then begun by the government with cement mills in the cities of Trident, Montana, and Portland, Oregon, and shipments of cement were made from those two cities.

The government paid for these shipments at the regular tariff rates less the applicable land-grant deductions. Now in its counterclaim the government contends that a special rate should have been applied to such shipments, and that the government has therefore overpaid the Company to the extent of the difference between the regular tariff rate less land-grant deductions and the special rate, which the government claims should be an "equitable rate". It is the contention of the government that when the contract between Northern Pacific and the government was entered into, it was the intention of both parties that the government should have an "equitable rate" on all shipments of cement to the dam.

As a means of recovering these alleged overpayments the government seeks reformation of the contract with Northern Pacific so as to make it include special rates from the two cities named. As a basis for this proposed reformation, it is claimed that there has been a mutual mistake in omission of cities other than the six named in the contract. The Company denies that there was any mistake on its part, and the terms of the contract, which sets out with particularity the six cities and the rates applicable to cement shipments from each, bear out the railroad's position. Further, the trial court found "there is no ground for reformation because the written contract fully and accurately expressed the agreement made by the parties." In the face of this, the government can hardly be said to have sustained the burden of proof resting on the party alleging the mistake and seeking reformation to "show exactly in what it [the mistake] consists and the correction that should be made. * * * The mistake must be mutual, and common to both parties to the instrument. It must appear that both have done what neither intended." Moffett, Hodgkins, & Clarke Company v. Rochester, 178 U.S. 373, 385, 20 S. Ct. 957, 961, 44 L.Ed. 1108. See also Mary-

land Casualty Company v. United States, 8 Cir., 169 F.2d 102, 111, and cases there cited.

■ Other than this, there is a clause in the contract itself which refutes the government's claim of a mutual mistake in omitting other cities. The last sentence of Section 12 of the contract states: "If the necessity arises for revising said rates or for the fixing of rates on additional items or from additional points, adjustments will be made in the established rates or such new rates will be made as may be agreed to by the authorized representatives of the Company and the United States." Thus the parties to the contract expressly provided for the exact situation which arose—"the fixing of rates * * * from additional points." Since the government chose not to negotiate new rates, and paid, without protest at the time, the regular tariff rate less land-grant deductions, the government must be held to have consented to have that rate be the contract rate from the two additional cities.

In the absence of a negotiated special rate from Trident and Portland, the government has no grounds for its counterclaim for overpayment on cement shipments from those two cities.

### Conclusion.

On consideration of the whole record the conclusion of the court is that the judgment appealed from is without error and it is in all respects affirmed.