**MINNESOTA AMUSEMENT COMPANY,**
a corporation, Appellant,

v.

**John Fred LARKIN, Appellee.**
**No. 16681.**

United States Court of Appeals
Eighth Circuit.
Jan. 31, 1962.

Mandt Torrison, St. Paul, Minn., for appellant. Bundlie & Kelley, St. Paul, Minn., and H. L. Fuller, Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., were with him on the brief.

Holton Davenport, Sioux Falls, S. D., for appellee. Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., were with him on the brief.

Before VOGEL, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

VOGEL, Circuit Judge.

Appeal here is taken from a judgment awarded in favor of John Fred Larkin, plaintiff-appellee, a resident of South Dakota, against defendant-appellant, Minnesota Amusement Company, a Delaware corporation, having its principal place of business and licensed to do business in Minnesota. Judgment was ordered by the District Judge for the Southern Division of the District of South Dakota, sitting without a jury. Diversity of citizenship and amount involved satisfy requisites for federal jurisdiction.

Plaintiff sought to recover damages for an anticipated loss for the period of his life expectancy because of an alleged breach of an agreement which plaintiff claims was entered into with the defendant.

The record indicates that the plaintiff, continuing a career of theater management commencing in the early 1900's, first came into the employ of the defendant in 1932, the year defendant was organized, at which time his work was in connection with defendant's theaters in St. Cloud, Minnesota. In 1941 he was transferred to Sioux Falls, South Dakota. In 1946 he was promoted to the position of district manager for the defendant's theaters in South Dakota, a position he held until 1949, at which time he was retired pursuant to a written agreement which is the core of the present controversy. The letter, subsequently accepted by plaintiff and comprising this agreement, was sent by the then president of the defendant, Harry B. French, to the plaintiff and read as follows:

"Minnesota Amusement Company
"Administration Office Minneapolis 3,
"17 North 6th Street Minnesota
 "June 6, 1949

"Mr. Fred Larkin
"State Theater
"Sioux Falls, S. D.

"Dear Fred:

 "This will confirm our conversation of a week ago last Friday to the effect that starting as of July 3, 1949, you will be retired as a full-time employee of ours.

 "In view of your long years of service to us, you will be retained on our payroll and we shall pay you the sum of seventy-five dollars ($75) a week.

 "Inasmuch as you are on the payroll as a full-time employee, we expect that you will render to us as requested from time to time your services as consultant and adviser in connection with theatre operation. Such service, however, shall be rendered by you only from such place as may from time to time be selected by you. Being on the payroll, Fred, entitles you to our group life insurance and hospital benefits. When you are in Minneapolis, naturally we want you to make the office your headquarters and discuss any matter that you think should be taken up as pertains to the operation and welfare of our theatres.

 "I am sending this letter in duplicate. Please sign one copy indicating your understanding of the above and return it to me. The other copy is for your own personal file. There are no other copies.

 "Kindest regards.
 "Very truly yours,
 "HARRY B. FRENCH
"HBF:JT
 "The contents of the above letter are in accordance with my understanding.

 . . . . .

 "J. FRED LARKIN"

Plaintiff signed the original of the foregoing, returned it to French and retained his copy.

In accordance with the agreement, plaintiff was paid $75 per week regularly thereafter until shortly after October 31, 1956, when he received from the defendant a letter advising of the termination of the agreement. Such letter, dated October 31, 1956, insofar as it may be pertinent to the plaintiff, was as follows:

"Mr. Fred Larkin
"1624 So. Fifth Ave.
"Sioux Falls, S. D.

"Dear * * * Fred:

"I have been advised by our New York office [1] that, effective January 1, 1957, your agreement with the Company re salary will be put on a two-year termination basis from that date.

"I wanted you to have this information as quickly as possible so that you can make your plans for the future accordingly.

"Insurance-wise I am certain that we will be able to work out a plan to continue your company insurance after that date. It may be necessary to convert it, but I will do everything within my power to continue it on the same basis as at present, with you paying the total premiums on a company rather than a conversion basis.

"This is not the kind of information I enjoy sending to you, but it is necessary under the circumstances.

"Kindest regards.
"Sincerely yours,
"CHAS. WINCHELL"

Payments to plaintiff continued until the first week of January, 1959, at which time they ceased. He has not been paid since that time.

Upon defendant's refusal to continue the payments subsequent to January 1, 1959, the plaintiff commenced this action claiming that there was a breach of the agreement, which agreement plaintiff contends was for life.

It was defendant's contention that the agreement was not for the life of the plaintiff, that it was terminable at will, and that it had fully paid plaintiff all sums due him under any and all contracts of employment or otherwise.

The basic issue is, of course, whether the contract between the parties was one for retirement on the basis of $75 a week payable as long as the plaintiff lived or whether it was, as claimed by the defendant, simply an agreement for limited employment, terminable at the will of the defendant and providing for $75 per week until so terminated. A careful examination of the letter and its acceptance does not indicate whether it is an agreement terminable at will or whether it is one binding the defendant to pay for the balance of plaintiff's life. The contract as written is indefinite. It leaves doubt. The trial court, sitting without a jury, determined, first, that the contract here between the parties was ambiguous, and, second, that other evidence could be received from which the intent of the parties in entering into the agreement might properly be ascertained. We think the trial judge was eminently correct in so doing. In United States v. Northern Pac. Ry. Co., 8 Cir., 1951, 188 F.2d 277, 280, this court said:

" * * * The question as to whether an ambiguity exists in a contract is to be determined by the court as a matter of law. 17 C.J.S. Contracts § 617; Whiting Stoker Company v. Chicago Stoker Company, 7 Cir., 171 F.2d 248; Golden Gate Bridge & Highway District of California v. United States, 9 Cir., 125 F.2d 872."

In Floyd v. Ring Construction Corp., 8 Cir., 1948, 165 F.2d 125, 129, certiorari denied 334 U.S. 838, 68 S.Ct. 1496, 92 L.Ed. 1763, we said:

"The law is 'that the terms of a contract, if it be ambiguous, are matters of fact to be determined in the same manner as other facts; by the jury, if it be a jury case, or by the court, if the jury be waived; while the construction of the contract and its legal effect are questions of law for the court.' Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co., 8 Cir., 99 F.2d 902, 916; National Surety Corporation

---

[1]. Defendant was the wholly owned subsidiary of American Broadcasting-Paramount Theatres, Inc.

of New York v. Ellison, 8 Cir., 88 F.2d 399, 402; State v. Fellows, 98 Minn. 179, 187, 107 N.W. 542, 108 N.W. 825; Bell Lumber Co. v. Seaman, 136 Minn. 106, 161 N.W. 383, 384; Lucas v. Ganley Bros., 166 Minn. 7, 206 N.W. 934, 936.

"It is the law, also, as the court observed in this case ( [D.C.,] 66 F. Supp. 436, at page 438), that *where ambiguity exists in a contract the construction the parties in their dealings and by their conduct have placed upon the terms will furnish the court with persuasive evidence of their meaning.* 17 C.J.S. Contracts, § 325; City of South St. Paul v. Northern States Power Co., 189 Minn. 26, 248 N.W. 288, 291." (Emphasis supplied.)

■ It is our duty here on appeal to review such evidence as the court received in explanation of the ambiguity appearing in the contract between the parties. In consideration of such evidence, we must take that view thereof which tends to support the findings and conclusions of the trial court, in the same manner as we would consider such evidence as tending to support the verdict of a jury had a jury been sitting in this case and had it found in favor of the plaintiff. We must accept all inferences which reasonably tend to support the conclusions of the trial court. City of West Plains v. Loomis, 8 Cir., 1960, 279 F.2d 564, 567–568; United States v. Skolness, 8 Cir., 1960, 279 F.2d 350, 352–353.

Testimony was received as to the history of events giving rise to the final written agreement between the parties, namely, defendant's letter of June 6, 1949, and plaintiff's written acceptance thereof. Such testimony indicated that in 1943 plaintiff told Mr. John Friedl, then president and general manager of the defendant, who at the time of trial was deceased,[2]

"* * * I was in very poor health and that I wanted to resign. I said 'I could obtain other employment which would pay me far more than I was getting and it wouldn't be so hard on my health, that the job in Sioux Falls was getting too rough for me to handle.' "

And:

"A. I sat down and Mr. Friedl said 'I don't question at all, Fred, that you could obtain employment paying you more than we are paying you. However,' he says, 'we are in a very, very serious emergency and we certainly don't want you to resign. We want you to go through this emergency and go as far as you can go. *If it becomes necessary to retire you, you will be retired at the same pay that you are receiving now, and it will be paid to you each and every week as long as you live.* You know from the way we are taking care of Mr. Hayes that we take care of our employees, and remember, if you stick with us you'll have nothing to worry about, your security is unquestionable.' (Emphasis supplied.)

"Q. What did you say?

"A. I said 'Well, I didn't know that I stood that way with the company.' 'Well,' he says, 'You found that you do' and he says 'Sioux Falls is too valuable a town to have hanging up in the air.' He said 'We've got to have definite commitments regarding it.' 'Well,' I says, 'I will give you a definite commitment—under these conditions I will stay and stick it out until they carry me out.' "

In the fall of 1943 plaintiff became ill and was hospitalized. Thereafter he returned to active work with defendant. In 1944 he was again hospitalized, and while so hospitalized, Mr. French, then district manager of the defendant, visited him.[3]

---

2. South Dakota, where the case was tried, has no "Dead Man's Statute" which would render inadmissible the conversations here in question. Cf., Minn.Stat. Ann. § 595.04.

3. At the time of trial Mr. French was wholly incapacitated and could not be called as a witness.

Plaintiff testified:

"A. Mr. French came into my room to visit me and he says 'Fred, how are you fixed for money?' and I says 'I am fixed all right, I can pay my bills.' 'Well,' he says, 'We want you to know that we will put up $1,000 or $10,000 if it takes it to put you back on your feet.' I said, 'I may never get back on my feet.' And he said, 'Fred, if you lay in bed and worry, you'll never get well. *Remember the company is behind you, and if it's the last thing they do they are going to take care of you.*' (Emphasis supplied.)

"I had a surgical operation there after which I came back and gradually worked back into the job.

"Going back to 1943 I commenced doing some work in the district at Mr. French's request."

In 1947 plaintiff again went to the hospital and following that again talked to Mr. French, who then had become president of the defendant. According to plaintiff, Mr. French told him:

"* * * 'You've got nothing to worry about, you'll be taken care of as long as you live.'"

On October 14, 1947, Mr. French wrote a letter to the plaintiff, Exhibit 4, a part of which is as follows:

"Minnesota Amusement Company
"Inter-Office Communication
"To Mr. Fred Larkin Date October 14, 1947
* * * * *

"Fred, as I told you before on several occasions, there is not one thing in this world you have to worry about except to get your health back. *You are secure with this company as long as you live and I want you to know that. We have not changed our position one iota,* and I repeat that what we want you to do is thoroughly relax. Don't think about the theatre; don't even go down to the theatre unless there is something there you want to get, because the moment you start going down, you begin to

get into it again and you can't relax the way you should with the various problems on your mind. * * *

"*Your pay check will come through just as regularly as the days come and go,* and as I told you before if you need any financial aid at all, all you have to do is let us know.

"Fred, if I have not made myself perfectly clear to you and have not convinced you *the company is behind you 100 per cent all the way,* then it is my fault, because that is just exactly what the company wants to do.
* * * * * *

"Sincere good wishes to you.
"Very truly yours,
"HARRY B. FRENCH" (Emphasis supplied.)

Plaintiff further testified to a conversation with Mr. French in 1949 after he attended a company meeting in Minneapolis:

"Q. Now, will you tell us what Mr. French said and what you said at that time and place?
* * * * * *

"A. Mr. French said, 'Fred, I noticed your health is very bad.' He said, 'You have stayed with the company through the good years,' he says, '*We're going to fulfill the promises that was made to you in 1943.*' He said, '*You will be retired, but retained on the payroll.* By retaining you on the payroll entitles you to the group insurance benefits and we may, from time to time, ask you for advice. We want you to get your health back and take a long rest.' He says, '*Your salary will be $75 a week and you will be retired as long as you live.*' (Emphasis supplied.)

"Q. What did you say?

"A. I said, 'Mr. French, I understood when I had the talk with Mr. Friedl in 1943 and it came up to the time when I would be retired that I would be retired on my present salary and I was getting $90 a week.' Mr. French felt——

"Q. It isn't what he felt.

"A. That's what he said. Mr. French said he 'felt that the $75 was better than 50% of the salary that I was then receiving' which was $138 a week, and he says 'by giving you this amount, it conforms to my plans and arrangements and is all I am authorized to pay you.' And I says, 'Well, if that's it, that's it.' I said, 'I don't like to retire but I fully realize that my health hasn't been good and I am willing to do anything or everything that I can for the company as long as I can and I want to remain a part of the company.' He says, 'I know you want to remain a part of the company and *within a few days you'll receive a communication from me informing you when your retirement will take place.'*" (Emphasis supplied.)

Following this conversation, which occurred in May, 1949, plaintiff received the letter of June 6, 1949, supra, to which was attached a memorandum with the printed heading "Memo from Harry B. French" addressed in handwriting to "Fred", and reading as follows:

"In case anything should happen to me, this letter will be a matter of record for you.

"Harry"

On June 10, 1949, the defendant over the signature of Harry B. French, its president, sent a letter to all department heads and district managers of the company, advising them as follows:

"After serving our company for more than twenty years, Fred Larkin, district manager of South Dakota, will take an extended leave of absence effective July 3, 1949. Fred will be on our payroll as a full-time employee and will contribute to the success of this company in an advisory capacity.

"Fred's health has not been too good the last couple years—the result of the strain during the war days when the government established an army camp and school in Sioux Falls and almost over night brought in nearly 40,000 soldiers. No manager has ever been confronted with a more exacting problem; it meant many extra hours of close supervision; it meant tactful handling of soldiers' exuberance, protection of property, and the diplomatic handling of regular local patrons.

\* \* \* \* \* \*

"This company has never had a more loyal, conscientious, and capable associate than Fred Larkin, and his contribution to this company and the entire industry is a record of spectacular achievement.

"I can think of no one who better exemplifies the qualifications required for a successful showman than Fred Larkin. His record should be an inspiration and paragon for every one in the business.

"Very truly yours,

"/s/ HARRY B. FRENCH"

█ We conclude that the foregoing evidence was properly admitted by the trial court to aid in interpreting the ambiguity in the written agreement entered into by the parties.

The trial court, on the basis of this evidence, found *inter alia*:

"5(a)

"That on or about June of 1943, for the purpose of inducing the plaintiff to continue in such employment, and withdraw a then tendered verbal resignation therefrom, the defendant, by its then president, in substance promised the plaintiff that if the plaintiff would continue in such employment until the plaintiff's health required retirement therefrom, the plaintiff would have security as long as the plaintiff lived and have throughout his life the same salary as the plaintiff was then receiving; that on the basis of such promise and relying thereon, the plaintiff agreed to continue and did continue in such employment until the retirement stated in the Court's

Finding No. 6 [the letter from the defendant of June 6, 1949, and its acceptance by the plaintiff]; that such promise made as stated in this finding was included in the background of such agreement, and the obligation on the defendant resulting from such promise entered into the consideration for such agreement."

From its findings of fact, and based thereon, the District Court made its conclusions of law:

"1.

"That the agreement between the plaintiff and the defendant, referred to in the court's Findings, and entered into on June 6, 1949, or thereabouts, is one for retirement, under which the defendant, in consideration of the therein specified services, which plaintiff agreed to render, became obligated to the plaintiff for all of the fringe benefits referred to in Plaintiff's Exhibit 1 and the weekly $75 payments, throughout and for the term of his natural life.

"2.

"That the defendant, under this record, ratified that agreement, as it met all of the obligations under it, during the period July 3, 1949 to January 1, 1959.

"3.

"That said agreement was made in South Dakota, where it also was performed as the plaintiff accepted the weekly payments at Sioux Falls.

"4.

"That the defendant's discontinuance of those payments and benefits as of January 1, 1959, constituted a breach on its part of that agreement, as of that date, which caused damages to the plaintiff as of that time in the sum of $23,763.29.

"5.

"That the plaintiff's acceptance of the weekly payments and other benefits from the defendant after he had received notice of discontinuance in Plaintiff's Exhibit 3, do not constitute a bar to his right to recover those damages.

"6.

"That the plaintiff is entitled to a Judgment against the defendant for the sum of $23,763.29 and interest thereon at the rate of 6% per annum from the first day of January, 1959, and costs in the sum of $ * * to be taxed by the Clerk in the manner and amount provided for by law."

Defendant contends that the contract between the parties is a Minnesota contract and that the laws of that state apply. Plaintiff takes the position that the laws of South Dakota are applicable. Counsel on both sides admitted in oral argument that that issue in this case is relatively unimportant excepting as it bears on the question of damages. We think, however, the trial court properly disposed of the conflict of law question with his conclusion No. 3, supra. The letter of June 6, 1949, written by the defendant in Minneapolis, Minnesota but mailed to the plaintiff in South Dakota and accepted by the plaintiff in South Dakota, represented the formal contract between the parties. True enough, there were many negotiations prior thereto. In 1943, when the plaintiff wished to leave the defendant's employ because of his health and the difficulties of his work with the defendant, promises of retirement for life were made. The understanding then was that if he would remain in defendant's employ that "If it becomes necessary to retire you, you will be retired at the same pay that you are receiving now and it will be paid to you each and every week as long as you live." Subsequently—and this occurred in Minneapolis, Minnesota—defendant through its president changed that to $75 per week, whereas at the time of the original promise in 1943 plaintiff had been receiving $90 a week. However, the date for final retirement was agreed to when the contract was reduced to written form in the letter of June 6, 1949, and its acceptance by the plaintiff in South Dakota.

We conclude that the trial court was correct that the place of contracting was South Dakota. Wastun v. Lincoln Nat. Life Ins. Co., 8 Cir., 1926, 12 F.2d 422 (affirming United States District Court, District of South Dakota); Restatement of Conflict of Laws, § 326, p. 405. Furthermore, by its terms, as found by the District Court, the contract was to be performed in South Dakota. Payments were made to plaintiff in South Dakota. Thus, the laws of that state are applicable hereto. As stated in Scudder v. Union National Bank, 1875, 91 U.S. 406, 412–413, 23 L.Ed. 245:

> "Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitation, depend upon the law of the place where the suit is brought."

■ A determination whether the agreement herein was one for retirement or for employment becomes necessary. We believe and hold that essentially the written contract of June 6, 1949, was for retirement rather than employment. It specifically said, " * * * you will be *retired* as a full-time employee of ours. * * * you will be retained on our payroll and we shall pay you the sum of seventy-five dollars ($75) a week." Retention on the payroll apparently entitled plaintiff to some fringe benefits, such as insurance. Plaintiff, if requested by defendant, was to give consultation and advice, which incidentally was never asked for during the years in which the defendant paid the plaintiff subsequent to July 3, 1949. Nevertheless, in no sense of the word could the contract be termed one of employment. The service of consulting and advising was purely incidental and plaintiff's name was placed on the payroll for the purpose of obtaining insurance benefits for him.

Additional support for the conclusion that the intention of the parties was to make a contract for retirement instead of employment is found in the negotiations up to the final writing of June 6, 1949. Note the oral statement in 1943 of John Friedl, then president and general manager of the defendant:

> " * * * If it becomes necessary to *retire* you, you will be *retired* at the same pay that you are receiving now, and it will be paid to you each and every week as long as you live." (Emphasis supplied.)

The statement of French in 1947:

> " * * * 'you'll be taken care of as long as you live.' "

The statement of French in his letter of October 14, 1947, to the plaintiff:

> " * * * 'You are secure with this company as long as you live and I want you to know that. We have not changed our position one iota, * * *.' "

> " 'Your pay check will come through just as regularly as the days come and go, * * *.' "

The statement of French in May, 1949, to the plaintiff immediately following a company meeting in Minneapolis:

> " '* * * You will be *retired*, but retained on the payroll. By retaining you on the payroll entitles you to the group insurance benefits and we may, from time to time, ask you for advice. * * * Your salary will be $75 a week and *you will be retired as long as you live*.' " (Emphasis supplied.)

> " ' * * * within a few days you'll receive a communication from me informing you when your *retirement* will take place.' " (Emphasis supplied.)

In a report to Leonard H. Goldenson, Paramount Pictures, Inc. (apparently a parent organization of the defendant at that time), President French, after reporting that Larkin, the plaintiff, was 66 years old and in ill health, was unable to

get around in the territory and had missed several cabinet meetings, stated:

"* * * 'So I suggested to him that he *resign* and I agreed to give him $75 a week. I did not put any time limit on it.'" (Emphasis supplied.)

* * * * * *

"'If the arrangement I make with Fred Larkin is not satisfactory with you, let me know and I shall abide by your decision.'"

As we have prior hereto stated, the written contract of June 6, 1949, contained an ambiguity in that it was not clear when the contract was to terminate and the trial court was correct in receiving evidence from which determination could be made as to the intent of the parties. Such evidence as has been referred to regarding the conversations between the plaintiff and the presidents of the defendant, as well as the letters written by the defendant, fully supports and justifies the trial court's conclusion that the contract was one calling for retirement pay for the balance of the plaintiff's natural life.

Defendant further contends here that even if this agreement were for life, the court erred in failing to find and conclude that it was invalid as unreasonable and beyond the authority of the officers making it. In support of such contention and with reference to the authority of Mr. Friedl and Mr. French to make the alleged contract with the plaintiff, the defendant offered into evidence contracts between defendant and the two ex-presidents. One, as to Friedl, reads in part:

"'3. Mr. Friedl hereby accepts the foregoing employment, and during the term of this Agreement Mr. Friedl agrees * * * that, in the performance of his said duties, he will be subject to and abide by the direction, control and instructions of the Board of Directors of the Employer and its respective controlled subsidiaries; without limiting the generality of the foregoing, Mr. Friedl agrees that, without the prior approval of the applicable said Board of Directors first had and obtained, none of the following things will be done by him:

* * * * * *

"'(d) No *employment* of or contract with any person for *employment* shall be made * * * which covers a period longer than from week to week * * *.'" (Emphasis supplied.)

Another contains the same restriction on the authority of Harry B. French.

Defendant cites cases dealing with contracts of employment as support for its claim of lack of authority on the part of its presidents. In this instance we are concerned with a contract to pay a pension for life on retirement.[4] However, even in a case concerning an employment contract for life, this court in Eggers v. Armour & Co., 8 Cir., 1942, 129 F.2d 729 at pages 732–733, speaking through Judge John Sanborn, said:

"There is, no doubt, a radical distinction between a contract for permanent employment of a stranger or an able-bodied former employee, where the consideration is merely a promise to render service, and a contract for permanent employment of an employee who has been injured and disabled in the employer's service and who releases a claim for personal injuries in consideration of being furnished a continuing means of livelihood. It seems to us, however, that there is no great distinction between the case of an employee who is given a life employment contract in settlement of his claim for injuries, and the case of an employee like the plaintiff, whose contract for life employment was not

---

4. For discussion on the distinction between the two situations, see Judge Medina's treatment of the question of apparent authority in Lee v. Jenkins Brothers, 2 Cir., 1959, 268 F.2d 357, 363–371, certiorari denied 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183.

made in connection with the settlement of such a claim but was made because he, after many years of service for his employer, had suffered a disability, in the line of duty, which incapacitated him from performing his former duties but left him able to perform light work which the employer could furnish. In the former case the employer, by making the contract, satisfies a legal claim for damages, while in the latter case he satisfies a moral claim to afford a means of livelihood to an employee incapacitated in the service of the employer after many years of employment. *If, in the former case, an employee might reasonably rely upon the apparent authority of the local agents or officers of such a corporate employer as Armour and Company to offer him a life contract of employment, we think that in the latter case an employee like the plaintiff could, with equal reasonableness, rely upon the apparent authority of such local agents and officers.*" (Citations omitted.) (Emphasis supplied.)

Therein this court reversed the District Court's directed verdict for the defendant and remanded the case for trial. The facts there, dealing as they did with the existence of a lifetime employment contract, are not nearly so persuasive for application of the rule as are the facts presented herein.[5] Lee v. Jenkins Brothers, note 4 supra, 268 F.2d at 371. In that we are here concerned with the question of apparent authority, the law of the place where Larkin relied upon such authority is controlling. Id. at 363. In Engler v. Ipswich Printing Co., 1934, 63 S.D. 1, 256 N.W. 132, the Supreme Court of South Dakota held that:

"* * * having voluntarily accepted the benefits derived from the employment of the respondent and having accepted the benefits of the agreement executed in its behalf by Mr. Tracy, the corporation is bound by such agreement, regardless of the question of the officer's original authority to enter into such an agreement." 256 N.W. at 135.

The defendant contends that the trial court erred in computing damages. It claims, first, that the contract cannot survive the inability of the plaintiff to render services. We have already pointed out that the trial judge was correct in determining that this was a retirement contract, not an employment contract, and that the so-called advice or counsel to be rendered was purely incidental thereto and did not change or alter its complexion. Defendant next argues that if the agreement be construed as a unilateral promise to pay, then there can be no right to recover for future installments still not due. It cites McMullen v. Dickinson Co., 1895, 60 Minn. 156, 62 N.W. 120, 27 L.R.A. 409 and Rishmiller v. Prudential Ins. Co., 1934, 192 Minn. 348, 256 N.W. 187. Concededly, McMullen does hold that on the breach of an *employment* contract

"* * * liability accrues by installments on successive contingencies. Each contingency consists in the failure of the servant without his fault to earn, during the installment period named in the contract, the amount of wages which he would have earned if the contract had been performed, and the master is liable for the deficiency." 62 N.W. at 122.

Rishmiller, which deals with a disability contract, says:

"* * * Defendant's obligation was merely to pay certain sums of money on certain dates as long as plaintiff lived or suffered the disability. Such a situation does not give plaintiff the right to the present

---

5. It will be noted from the contracts between the presidents of the defendant and the defendant that the limitation on authority went to "employment of or contract with any person for employment" and has no reference to retirement agreements or settlements.

value of future payments. He must await the due dates." 256 N.W. at 189.

Defendant cites other cases, mainly those concerning employment contracts. The theory of recovery under all of the cases involving breach of employment contracts is that the damages should be reduced by the amount the plaintiff earns or reasonably could be expected to earn during the unexpired period of the contract. A like possibility of reduction in the amount of damages may be applicable to disability contracts where future disability has not been ascertained. The Minnesota rule of McMullen and Rishmiller requires a plaintiff to await the due dates. It can then be ascertained what the plaintiff earned or should have earned in a case involving an employment contract, and whether or not the plaintiff was actually disabled under a disability contract. Other courts, however, have allowed full recovery upon breach. Hollwedel v. Duffy-Mott Co., N.Y.C.A., 1933, 263 N.Y. 95, 188 N.E. 266, 90 A.L.R. 1312, and annotation 90 A.L.R. 1318, et seq. It must be conceded that the cases dealing with employment contracts have no applicability here. There is no possibility of the amount of recovery fluctuating in accordance with plaintiff's possible earnings, even if he had any. By the contract plaintiff was "retired" and under the agreement he was to be paid $75 weekly as long as he lived. For like reason, cases involving disability contracts are not applicable. His disability is not involved. The trial court determined that because of defendant's breach of the contract, plaintiff was entitled to anticipate the payments and not be required to await due dates. The right to payment was not dependent upon actual earnings or actual disability. While no South Dakota cases have been cited on either side of the question, we will accept the considered determination of the trial court as to the local law, unless clearly convinced to the contrary. Citizens Ins. Co. of New Jersey v. Foxbilt, Inc., 8 Cir., 1955, 226 F.2d 641, 643, 53 A.L.R.2d 1376; Central Elec. & Gas Co. v. City of Stromsburg, 8 Cir., 1961, 289 F.2d 217, 220. We accordingly find no error in the trial court's awarding of damages based upon installment payments in the future.

 Defendant finally complains that in arriving at the amount of damages

"The trial court reached into the air for a period of life expectancy. The length of this expectancy is based upon no evidence in the record. Although the court found (R. 72):

"'That the plaintiff, in view of his poor state of health, had a life expectancy of not more than 6.74 years.',

the finding as to length of expectancy is wholly unsupported by any evidence."

The use of mortality tables as a basis for the award of damages has long had the approval of the courts. Pierce v. Tennessee Coal, Iron & Ry. Co., 1899, 173 U.S. 1, 10–11, 19 S.Ct. 335, 339, 43 L.Ed. 591:

"* * * 'in order to assist the jury in making such an estimate, standard life and annuity tables, showing at any age the probable duration of life, and the present value of a life annuity, are competent evidence' * * *."

There was evidence in this record that a person of plaintiff's age on January 1, 1959, had a life expectancy of 8.73 years. The able trial judge, in exercising the discretion which squarely rested upon him as the finder of the facts, reduced that life expectancy to 6.74 years because of the plaintiff's poor health. He found:

"14.

"That the plaintiff, as of January 1, 1959, in view of his poor state of health, as disclosed by this record, had a life expectancy of not more than 6.74 years; and that the amount of capital required to purchase an annuity, which as of that time would have paid him $75 per week during such period is $23,500.-80. This is based on the standard

form annuity table referred to in this record showing such annuities usually computed on a 2½% basis and the profit on the transaction out of additional income realized by the seller as that sum is invested at current higher interest rates."

We think the defendant here should not be heard to complain and that the entire computation of damages was sound and may not be successfully challenged.

We have considered all questions raised by the defendant on this appeal and find them to be without merit.

Affirmed.