S. N. JACOBI, Plaintiff,

v.

INTERNATIONAL BUSINESS MA-
CHINES CORPORATION,
Defendant.

C. A. No. 66–776.

United States District Court
D. South Carolina,
Florence Division.

Dec. 22, 1967.

Billy R. Craig, Floyd & Craig, Harts-ville, S. C., for plaintiff.

Harold W. Jacobs, Cooper, Gary, Nexsen & Pruet, Columbia, S. C., for defendant.

DONALD RUSSELL, District Judge.

The defendant, sued by the plaintiff, a former Sales Representative in its data processing division, to recover commission payments alleged to be wrongfully withheld, has moved for summary judgment. Such motion is based upon the record, including the pleadings and the depositions taken herein.

The defendant is engaged, among other things, in the leasing of highly sophisticated data processing equipment, and, for purposes of negotiating and conserving such leases,[1] employs Sales Representatives such as the plaintiff. The compensation of all Sales Representatives is governed by the provisions of a written Sales Compensation Plan contract.[2]

This controversy involves the proper construction of such Sales Compensation Plan, as it applies to plaintiff's commission compensation for the years 1963 and 1964.

1. These leases are referred to as sales and will be often described as such hereinafter. They are not, however, real sales and the distinction is important.

2. Since admittedly this Plan represents the contract for compensation upon which plaintiff bases his action, it may be referred to hereinafter sometimes as the contract between the parties, rather than as the Sales Compensation Plan.

The defendant contends that, in computing plaintiff's commission compensation, it followed the plain provisions of the Plan and paid the plaintiff the full amount due him for the years 1963 and 1964. The plaintiff's position is that his account was debited with certain items in 1963 and 1964, which, under a proper construction of the Plan, should have been debited in the same manner in which such items had been credited in previous years. As a result, according to plaintiff's contention, the defendant failed to pay him the sum due him for the years 1963 and 1964, for which he demands judgment.

■ This difference between the parties must be resolved by an interpretation of the Sales Compensation Plan. Concededly, the Plan fixed the plaintiff's right to commission compensation. Though drafted by the defendant, it was accepted by the plaintiff, who, incidentally, is a person of superior intelligence and education.[3] If such Plan is not ambiguous, (Cf., Cram v. Sun Insurance Office, Ltd. (C.C.A.4, 1967) 375 F.2d 670, 674,) the determination of the amount of commission due plaintiff for 1963 and 1964 under such Plan presents a question of law for resolution by the Court, which issue may appropriately be adjudicated by a motion for summary judgment. Johnson v. Nationwide Mutual Ins. Co. (C.C.A.4, 1960) 276 F.2d 574, 581; New Wrinkle v. John L. Armitage & Co. (C.C.A.3, 1956) 238 F.2d 753, 757; Ammons v. Franklin Life Ins. Co. (C.C.A. 5, 1965) 348 F.2d 414, 416, 14 A.L.R. 3d 776; Robert L. Ferman & Co. v. General Magnaplate Corp. (D.C.N.J. 1963) 33 F.R.D. 326, 331; Department of Highways v. United Gas Pipe Line Co. (C.C.A.5, 1958) 258 F.2d 359, 360.

The plaintiff, under the Sales Compensation Plan, which applied, with certain modifications unimportant to the issues herein, to the several years of plaintiff's employment by defendant, received a fixed monthly salary, along with a sales commission computed under a formula set forth in the Sales Plan. For purposes of calculating the commission, the Sales Plan provided for the establishment by the Branch Manager under whom the Sales Representative worked of a monthly sales quota or goal expressed in points assigned to each dollar of sales, reduced by debits for any cancellations or deferrals during such period. To such sales quota was assigned each year a specific dollar value or commission payable to the Sales Representative. This was described as the Sales Representative's incentive sales base. Both the sales quota and the incentive sales base varied from year to year during the years of plaintiff's employment by the defendant. The Sales Representative's actual commission in any year was arrived at by measuring his performance, expressed in quota points, calculated as set forth above, against his incentive base. Thus, if his actual sales points earned during the period, calculated in relation to his sales quota, was double his quota, he received, by way of commission, twice the incentive sales base fixed for such quota; if, on the other hand, his actual sales points aggregated only one-half his sales quota, he would be paid in commission only one-half his incentive sales base.

■ So far, the parties are in agreement. Their difference revolves about the time for debiting cancellations or deferrals[4] against his sales quota in determining to what extent the Sales Representative has met or exceeded his quota. There is no dispute that, in determining the extent the sales quota has been attained or exceeded, such cancellations or deferrals[4] against his sales quota in de-

---

3. Plaintiff is a graduate of Princeton University. He left the employment of the defendant to become a member of the faculty of the University of South Carolina, as a lecturer and research associate in economics. Page 53, Deposition of the Plaintiff.

4. Cancellations and deferrals being the same debits under the contract and are often spoken of interchangeably herein, since their treatment is largely the same in the contract.

(Page 9, Deposition of the Plaintiff.) The issue between the parties is whether such cancellation or deferral debit should be charged back against the original credit points given for such sale so cancelled or deferred, requiring a re-calculation of the Sales Representative's commission for that period, or is to be charged against his points earned by sales during the actual period when the cancellations or deferrals were made. Specifically, the sales involved in the deferrals herein occurred in 1961 and 1962 and earned commissions for the Sales Representative in those years; the deferrals occurred in 1963 and caused a loss of sales points in 1963, thereby reducing plaintiff's commission in 1963 and 1964. Since the sales quota and the incentive base for the years when the sales were made and the deferrals occurred were different, the results in terms of commission, arising out of the crediting of the sales in one year and the debiting of the deferrals in a later year, were different. To be specific, the quota points represented by sales in 1961 and 1962 involved in this controversy had a value of $8,000.00 in commission; on the other hand, the deferral in 1963 of such leases, as represented by sales points valued under plaintiff's sales quota and incentive base as fixed for that year, amounted to $21,000.00. It is to recover this difference (i.e., $13,000.00) that plaintiff sues.

It is plaintiff's contention that, so far as sales commissions are concerned the quota points assigned to the sales and to their deferral should be given the same value, irrespective of the year in which the two occurred; in other words, that the credit given for the sales in 1961 and 1962 should be the same as the debit for the deferral of those same sales in 1963 and 1964. The defendant, however, urges that, under the clear language of the contract, the sales are to be given quota points when made, which quota points have the value fixed by the sales incentive base for the years involved, and that the deferral debits are to be given quota points "automati-

cally" at the value of such points calculated in the terms of sales incentive base applicable at the time the deferrals are recorded.

The reason for such conflicting positions between the parties over the valuation of credit and debit points in the different years—which is the heart of this controversy—arises out of the fact that in 1963, by way of increasing plaintiff's compensation through an increase particularly in the sales incentive base, the defendant gave a substantially increased value to plaintiff's sales quota points over that prevailing in 1961 and 1962, a change calculated to benefit materially the plaintiff. Accordingly, every dollar of sales by the plaintiff in 1963 and 1964 was worth in commission earnings almost two and a half times more than a like dollar of sales in 1961 and 1962. Similarly, every deferral or cancellation involved a commensurate loss in commission earnings. It is somewhat ironic that it is this increase in plaintiff's commission compensation that gives rise to his complaint.

While the argument of the plaintiff may at first blush be appealing, it, however, does not accord with either the letter or spirit of the contract; and it is the contract which determines the rights of the parties. Under Section C, 2, a (ii) of the contract, the timing of a debit for cancellation or deferral is fixed "As of the date the Cancellation * * * is approved by the Branch Manager." It does not relate back to the date the sale was made; it applies on the date of approval of the cancellation or deferral. Again in paragraph E, 9, b, to which plaintiff referred in his deposition and upon which he largely grounds his claim, the contract expressly provides that, "When orders are reclassified to the 'Scheduled—Uncredited—Delinquent' or 'Scheduled—Uncredited—Deferred' categories, applicable selling Quota Points, * * * will be debited *automatically* to the Sales Representative" (Italics added.) Thus, when the sales in question were deferred, such deferrals brought an automatic debiting

against the Sales Representative's quota, and, again, do not relate back to the original credit. To clarify the point further, the contract states in paragraph B, 2, c. that, "The Quota Points which are credited or *debited* to a Sales Representative's Quota Record will be entered in the month when the transaction is processed by the Region without regard to a change in the monthly Quota(s) or Incentive Base(s)."

This timing of a cancellation or deferral, for purposes of calculating a Sales Representative's quota points, is neither arbitrary nor unreasonable. The plaintiff as a Sales Representative under the Sales Compensation Plan did not simply operate as a salesman, making initial sales. His "duties and responsibilities", as paragraph 2 of the introduction to the contract makes clear, consisted of the "duty to *conserve* and increase revenue" in connection with the leases of equipment. (Italics added.) Subsequently, in paragraph 4 of this same introduction, it is stated that the Sales Representative "will assume responsibility * * * for all accounts" (or leases) within his territory assignment, irrespective of whether he originally sold them. This emphasis upon the conservation of accounts by the Sales Representative follows from the defendant's method of doing business. It leases equipment. It is accordingly not interested simply in the original sale or lease, cancellable or deferrable as it is; it has an equal, or greater, interest in the continuity of such lease, in keeping the customer "sold", in preventing a cancellation or deferral of a sale. Because the continuance of a lease was thus clearly as important to the defendant as an original sale, the maintenance (or "conserving", as the contract terms it) of existing leases was as much a part of the plaintiff's duties as the initial selling or negotiating of those leases.

To emphasize his duty to "conserve" all existing accounts, the defendant sought, through the debiting of quota points to the Sales Representative, to make a cancellation or deferral of a lease, a loss of commissions to him then and there, just as a sale brought credits and a gain of commissions.

Failure to "conserve" a lease accordingly called for a debit against the Sales Representative in the same manner as a sale warranted a credit. In the case of a cancellation or deferral, this failure of the Sales Representative's "duty to conserve" resulted when the deferral or cancellation itself occurred. What is being penalized is the failure to keep the lease current; and this event takes place when the lease is cancelled or deferred. It is this date on which the debit is charged against the Sales Representative under the contract. And this is the way the defendant treated the deferrals in question in its settlement with the plaintiff. In my opinion, this was proper.

The plaintiff, in his deposition, suggests that, if only the defendant had given him "deferred credit" for the sales in question in 1961 and 1962, he would have received no quota points in 1961 and 1962 for these sales and would not accordingly have been debited with quota points in 1963 when these sales were deferred. And he argues that this is what should have been done. In fact, at one point in his deposition, he stated his cause of action in these terms.[5] It might be noted that this argument apparently concedes that the proper time for charging debits for cancellation or deferral is the date of the cancellation or deferral, and not the date of sale. The real objection to this argument, however, is that it runs counter to what the plaintiff himself chose to do. It is an argument that clearly did not appeal to the plaintiff in 1961 and 1962 when he made these sales. At that time he might

---

5. "Q Now is it your claim then that your having prematurely received this eventually cost you a penalty of Thirteen Thousand Three Hundred Dollars or thereabouts?

"A That is essentially it.
"Q Is that the essence of your complaint against I.B.M.?
"A Yes."
(Plaintiff's Deposition, pp. 57–8.)

have asked that he be given "deferred credit" for such sales. The option was his; he did not avail himself of such option, an option open only to him;[6] he voluntarily chose immediate credit for such sales, collecting thereon commissions in 1961 and 1962. It is only afterwards in 1963 when these sales are deferred and have brought the plaintiff debits in his commission account for that year that it occurs to him that the transaction should be reversed. The plaintiff cannot reverse in 1963 an action he freely and voluntarily chose to take in 1961 and 1962 simply because in retrospect he appears to have made a bad choice—and a bad choice only because in 1963 the defendant made a substantial improvement in the basis of calculating plaintiff's commission compensation.

The plaintiff contends finally that his Branch Manager was amazed at the construction placed on the contract by the defendant and would urge from this that the language of the Sales Plan was ambiguous.[7] I do not construe this as the import of the Branch Manager's testimony. The Manager did not testify that he did not understand the Sales Plan to accord with the defendant's construction; he did say he was "somewhat surprised at the magnitude of the dollars that he (the plaintiff) claimed he was concerned with". But, as we have seen, this "magnitude" arose out of the fact that in 1963 the defendant had more than doubled plaintiff's commission basis through a substantial improvement in his sales incentive base. If the defendant had not so materially increased plaintiff's commission basis, it is doubtful this controversy would ever have arisen.

It is my judgment, the Sales Plan, though involved and prolix, is not ambiguous. The action taken by the defendant accords with its provisions and the defendant has not been guilty of any fraud in its dealings with the plaintiff. Accordingly, the defendant is entitled to summary judgment in its favor, and

It is so ordered.

---

6. The plaintiff did testify that the defendant might have taken this action on its own but, as he qualified it, only "after a discussion with the sales representative involved" giving "the reasons why it would be done." This was denied by the defendant's witnesses; and the plaintiff conceded that he had never known of such action being taken "unilaterally" (p. 61 of Jacobi's deposition), that is, without the Sales Representative's consent. Whether the defendant could or could not have taken such action with the consent of the plaintiff is, though, beside the point. It was not done; the credit was not deferred; the plaintiff did not forego his commissions on account of these sales.

7. Whether a contract is ambiguous is a question "to be determined by the court as a matter of law." United States v. Northern Pac. Ry. Co. (C.C.A.8, 1951) 188 F.2d 277, 280.