EASTMOUNT CONSTRUCTION COMPANY and American Surety Company, Appellants,

v.

TRANSPORT MANUFACTURING & EQUIPMENT COMPANY, Appellee.

No. 16608.

United States Court of Appeals Eighth Circuit.

March 14, 1962.

Rehearing Denied April 7, 1962.

---

Clifford B. Kimberly, Kansas City, Mo., made oral argument for appellants and was on the brief.

Rodger J. Walsh, Kansas City, Mo., made oral argument for appellee, and

Davis, Thomson, Van Dyke, Fairchild & Walsh, were with him on the brief, same address.

Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.

BECK, District Judge.

This is a diversity suit with all of the jurisdictional requirements satisfied. The trial court awarded judgment for the full amount claimed by the Transport Manufacturing & Equipment Company in its complaint, with interest from the date of the acceptance of the work under the sub-contract and costs. The trial was to the court without a jury. This appeal is from that judgment.

Briefly summarized for purposes of presenting the nature of the case, its background, alignment of the parties and their respective interests as they appear from the record, we have: (1) a typical prime contract between Kansas City, Missouri, and the George Sheaf & Company, Inc., for the construction of the Turkey Creek Pumping Station; (2) certain grading, dirt moving and top soil placing operations in the prime contract, subcontracted to Yerington Construction Company on February 25, 1955; (3) its assignment with consent from all other parties interested to plaintiff, hereinafter referred to as Transport; (4) a change in the name of the George Sheaf and Company, Inc., to Eastmount Construction Company and by merger a final change to Mountain States Construction Company, one of the defendant-appellants, hereinafter designated as Mountain States; (5) American Surety Company, the other of the two appellants and (6) Transport, Mountain States and the American Surety Company as the only litigants interested in the final outcome.

Transport's complaint, insofar as it has material bearing on questions raised here, is to the effect that it had performed all of its obligations under the subcontract; that the unpaid subcontract balance was $15,046.90 and that it for those reasons was entitled to judg-ment against the defendants for that sum with interest from February 25, 1955, and costs.

The American Surety Company's answer is a general denial for want of sufficient information and knowledge as to the facts.

Mountain States in its answer admits that Transport "performed certain dirt work under the contract", denies the amount of the claim, avers that such a sum as may have been due "is based upon the terms and conditions of the contract", holds, top soil requirements under Item 3 to be governed by the "contract and specifications" and the amount in dispute to be unascertained and unliquidated. Denied is its counterclaim for $271.45 in Transport's reply.

Pre-trial proceedings, aside from waiver of formal proof as to use of exhibits, resulted in Mountain States' reading the following statement into the record:

"Defendant admits that in connection with Item 1 of the subcontract, which is the subject of controversy here, there was a retention of $6,728.00. Defendant admits that on Item 2, no work was done and no claim for controversy exists here. Defendant admits that on Item 4 a retention of $278.25 was made by defendant, making a total retainage of $7,006.25. Defendant claims that on Item 3 plaintiff was overpaid $841.09, by reason of the computation of the owner's engineer, that is 5,322 cubic yards of back fill required by that computation at the contract price of $1.33 per cubic yard, make a total contract price of $7,078.26. There has previously been paid $7,919.35 on this same Item 3 based on current estimates, leaving an overpayment of $841.09, leaving a balance of $6,165.16 which defendant admits owing and offers to tender into Court",

and also in an agreement:

" * * * that the controversy is now limited to the amount of top soil placed or to be placed on the proper-

ty under the contract. Plaintiff is claiming $15,046.90 on this item.",

and in another:

"* * * that nothing in the specifications other than paragraphs 1–21 and 1–22 are pertinent to this controversy, and nothing in the prime contract with the City of Kansas City is pertinent to Item 3 involved here other than those items.",

again:

"* * * that there is nothing in the plans and specifications other than Paragraphs 1–21 and 1–22,[1] which indicates the number of cubic yards of material required to be used in Item 3.",

and in one more:

"Plaintiff stipulates that all the grading required in preparation for placing top soil was done by plaintiff under Items 1 and 4 of plaintiff's Exhibit 1."

The trial court's Findings of Fact and Conclusions of Law in the form of an informal statement made from the Bench at the close of the trial of the case may for brevity reasons and designation of material aspects be summarized as follows: (1) that the record presents but two issues, one factual, the other legal that have not been disposed of by stipu-lation, by admission or by pre-trial conference orders; (2) that the factual one involving quantity of top soil removed from the borrow area and placed on the work site has been established beyond any reasonable question by all of the evidence in the case; (3) that the subcontract, if not ambiguous "in its method of determination and payment for top soil moved, is at least silent in spelling out a method for calculating it"; (4) that "explanation and interpretation by acts of the parties themselves" therefore "may be utilized in arriving at the means of the contract"; (5) that the subcontract itself does not set out a precise method for determining the amount of soil removed; (6) that the reference "to a depth of four inches" in the last clause of paragraph 1–22 relates directly to the term "minimum depth of four inches" in the first part of that paragraph; (7) that as a practical matter there is no way "to guarantee that there is exactly four inches of finished grade put on top of a rough grade, sub-grade proposition, which, by common knowledge, is always irregular"; (8) that "if it isn't irregular, then it is in turn a finished sub-grade, and that is not what the contract specifications call for when they are referring to sub-grade"; (9) that Clifford Henry Kulenburg was the project en-

1. "1–21—GRADING. After other outside work is finished and all backfilling and embankments completed and settled, top soil shall be applied as hereinafter specified under Paragraph 1–22 and all areas on the site of the work which are to be graded shall be brought to the true grade at the specified elevations and slopes. All slopes shall be trimmed and dressed by hand and other surfaces so graded that effective drainage is secured.
All grading and surfacing shall be completed to the satisfaction of the Engineer.
1–22 TOP SOIL. At the start of excavation operations, the Contractor shall remove sufficient top soil up to a maximum depth of 8 inches, to surface all fills, embankments, and any other areas on the site of the work where the original top soil has been covered or damaged, to a minimum depth of 4 inches. This top soil shall be free from surface vegation [sic] more than 6 inches in heighth, [sic] trash, and debris and shall be removed, stored, and uniformly spread and graded over the specified areas as directed by the Engineer. Top soil shall be placed after all other construction work on, across, or over such areas has been completed. Prior to placing top soil on any areas to be so surfaced, the compacted subgrade shall be scarified to a depth of not less than 2 inches for the bonding of the top soil with the sub soil. Top soil shall then be evenly spread, compacted, and graded to the specified thickness and to the elevations and slopes shown on the drawings. Compaction of the top soil shall be effected by one pass of a flat roller of a weight as approved by the Engineer. Additional top soil, if required, to surface all embankments and fills constructed under this contract, including all areas graded as indicated on the plans and damaged areas, to a depth of 4 inches, shall be provided and placed by and at the expense of the Contractor."

gineer; (10) that various stages of the project was accepted as the work was going on "and, at least, there was no objection to the completed sub-grade or rough-grade" and (11) from the deposition of Kulenburg:

"* * * that there were stakes out that were placed there for the sub-grade. In other words, the sub-grade was established by a grade marker of one kind or another, and in the absence of testimony to the contrary, it is necessary to assume that, as the work was progressing along and was either accepted as it progressed, or at least no objection was made to it, which in itself would involve an estoppel so far as the general contractor was concerned, that the sub-grade was completed to specifications."

Others, in the same statement are to the effect that top soil placing was to be continued until the project engineer was satisfied and that they would have to keep putting top soil on there until the resident engineer was satisfied.

The court then adds and concludes its decision by making the following commentary:

"Now, Gentlemen, that line of testimony conforms completely with my common experience in the method of construction used in this type of work. In other words, here is a contract which has no limitation clauses in it for the amount of top soil, except that it says "to a minimum depth of four inches." It doesn't say that you can't pay, as it could very well have said, on more than 5,500 cubic yards. It simply says, "top soil added or brought in at the rate of $1.33 per cubic yard." To the extent that the contract doesn't spell out how you are going to determine the amount, the parties, by their own conduct, have supplied the deficiency in the contract, whether it be called an ambiguity or whether the contract is simply silent on it, and the parties, by their own conduct prior to any controversy about

it, construed it themselves. The fact remains that in November of 1956, by a notice by a man who was authorized to represent the defendant in this proceeding, he stated that those amounts will be determined by cross-sectioning the borrow area—which is one of the two or three established methods for determining quantities under a contract similar to this one.

Now, as I understand it, the evidence thus far has established this: —either the contractor, or the general contractor, or the City has approved the work of bringing the rough-grade or the sub-grade up to prescribed standards. That is Kulenburg's testimony. It was staked, the sub-grade was, and there was no objection to it, so presumably that specification was met.

The next step comes into putting top soil on it to a minimum depth of four inches, all subject to the overall requirement that all grading and surfacing shall be completed to the satisfaction of the engineer.

There was testimony by all of them that there were certain spots where they required additional top soil to go in there; some of them where it was not. There were certain areas where it had built up down at the bottom of grades, where it was necessary to bring it up, or to dump other soil in there to level it off—a practice that is universal when you are dealing with fine grading work on excavating jobs such as this one.

Under those circumstances, it is my opinion that the contract requires defendant to pay for such top soil as may have been placed on that work, soil at the rate of $1.33 per cubic yard, and under those circumstances it is my judgment that the verdict in this case must be for the plaintiff, and under the various items of testimony that are in the record, the total amount should be in the sum of $15,046.90 * * *",

with interest on that sum from the acceptance date of the contract on May 1, 1957.

The items entering into the computation of the amount of the judgment are a part of the evidence referred to in (3) of the trial court's findings. Included are: (1) 12,000 cubic yards of top soil taken from the cross section borrow area and placed under Item 3 of the subcontract at $1.33 per unit, $15,960; (2) retention payments for work completed on the excavation, backfill and reservoir phases of the subcontract during 1955 and 1956, $7,006.25; (3) total $22,966.-25; (4) credit for payments made to Transport $7,919.35, and (5) the amount of the judgment the trial court allowed.[2]

Appellants' first two out of its three assignments of errors and the arguments in support thereof, are to the effect that the trial court committed prejudicial error, as it held the subcontract ambiguous or at least uncertain in its terms and evidence as to supposed construction by the parties properly admitted to give it meaning.

If from the subcontract it can be said that its terms are "clear, certain and definite", then its provisions are binding and controlling and are to be accepted "without reference to any rules of interpretation," since courts are without right to make a contract for the parties different from the one they actually made. Pitcairn v. American Refrigerator Transit Company, 8 Cir., 101 F.2d 929 (1939). But as said in the same case:

"* * * if the contract is ambiguous or obscure, it is open to interpretation. Generally speaking, the cardinal rule of interpretation is to ascertain, if possible, from the instrument itself the intention of the parties, and to give effect to that intention. Where there is obscurity or ambiguity, however, the language used should be read in the light of all the surrounding facts and circumstances, including the acts of the parties indicating what interpretation was placed upon it by the parties themselves. *Contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties.*" Old Colony Trust Company v. Omaha, 230 U.S. 100, 33 S. Ct. 967, 57 L.Ed. 1410; Topliff v. Topliff, 122 U.S. 121, 7 S.Ct. 1057, 30 L.Ed. 1110; Brooklyn Life Insurance Company of New York v. Dutcher, 95 U.S. 269, 24 L.Ed. 410; Sternberg v. Drainage District, 8 Cir., 44 F.2d 560; Powell v. Baker Ice Machine Company, 8 Cir., 8 F.2d 125, and Wabash Railway Company v. American Refrigerator Transit Company, 8 Cir., 7 F.2d 335. (Emphasis supplied.)

To the same effect is Pasquel v. Owen, 8 Cir., 186 F.2d 263 (1950), where Judge Gardner speaking for this court made the following comment:

"* * * the interpretation placed upon it by the parties prior to the time it became a matter of controversy is entitled to great, if not controlling, influence in ascertaining the intent and understanding of the parties and courts will generally follow such practical interpretation." Old Colony Trust Company v. City of Omaha and Pitcairn v. American Refrigerator Transit Company, supra; Thomson v. Thomson, 8 Cir., 156 F.2d 581; Floyd v. Ring Construction Corp., 8 Cir., 165 F.2d 125 and Craig v. Thompson, 8 Cir., 177 F.2d 457. (Emphasis supplied).

2. Omission of Mountain States counterclaim, though not included in that computation, is not assigned as error or argued on this appeal. Hence abandoned. Pet Milk Company v. Boland, 8 Cir., 185 F.2d 298 (1950); General Finance Loan Company v. General Loan Company, 8 Cir., 163 F.2d 709 (1947), cert. den. 332 U.S. 851, 68 S.Ct. 356, 92 L.Ed. 421, and Rokey v. Day & Zimmermann, 8 Cir., 157 F.2d 734 (1946), cert. den. 330 U.S. 842, 67 S.Ct. 1082, 91 L.Ed. 1288.

As we evaluate the contentions in support of those assignments, we find conflict between the last sentence in paragraph 1–22 of the subcontract and Item 3 thereof, in that the last clause of that sentence in conjunction with other parts thereof calls on the contractor to provide and place the top soil at his own expense, while "topsoil hauled in, including fine machine grading", prescribes payment at a fixed price. Another one, "topsoil hauled in" carries the connotation of unlimited quantity, "additional topsoil, if required * * * to a depth of 4 inches", a limitation. Implicit, in the language of Item 3 is the inference that it favors Transport, while the mentioned terms in 1–22 gives the advantage to the author of the contract.

Tenable, also, under these assignments, is the difference in the contract requirement of "to a minimum depth of 4 inches", as a top soil specification on the one hand, and the other, "to a depth of 4 inches", since minimum is defined as: "The least possible quantity, amount, or degree that can be assigned in a given case under fixed conditions; of the smallest possible amount or degree; least; smallest. It is the opposite of 'Maximum' ". 58 C.J.S., p. 806. Again, an ambiguity, with one provision giving permission for more than 4 inches of top soil, and the other prescribing a set limit.

Exactly what is meant by the parties in view of those conflicts, is not clear. Though the typewritten provisions of Item 3 in the subcontract that: "*Topsoil hauled in, including fine machine grading, per cu. yd. $1.33*" (unit price) obviously supersedes the last sentence in paragraph 1–22,[3] there is no language covering, *how much*. (Emphasis supplied). Uncertainty, also, is in the omission to cover the precise amount of top soil needed out of the 8 inch preliminary excavation to perfect the subgrade.

Overall uncertainty as to quantity of top soil which was to be hauled in, placed, and paid for at said unit price is apparent from the face of the subcontract. The trial court held it to be ambiguous or silent as to amount of needed top soil, but resolved, as evidence was admitted to show that the parties were in agreement[4] on subgrade specifications having

3. Section 2 of the printed part of the subcontract provides: "If any of those standard printed provisions are varied by the typewritten terms of agreement on the face of this instrument, the typewritten provisions shall prevail." See also 17 C.J.S. Contracts § 310, p. 728.

4. That agreement is based on the following: "Plaintiff stipulates that all the grading required in preparation for placing top soil was done by plaintiff under Items 1 and 4 of plaintiff's Exhibit 1", and in the statement of the appellants in their brief that: "It was further agreed * * * that all the grading required in preparation for placing topsoil was done by plaintiff under items 1 and 4 of the subcontract agreement."

The subcontract insofar as it relates to Items 1 and 4 provide:

"1) Excavation, backfill, berm and compaction except solid rock excavation, per cu. yd. .58 (Unit Price)

"Payments will be made on the actual quantity excavation as mutually determined by cross sections before and after excavation. This unit payment for excavation shall include the following work items and no separate payment will be made for them:

"A) Site clearing including the removal of all loose debris, junk, trees, wood or other unsuitable fill materials.

"B) Scarifying to provide proper bond in areas to be filled.

"C) All structural backfill, site fills and embankments, using approved excavated material.

"D) Rough grading and compaction if specified.

"This unit payment does not include any of the following work:

"a) Hand excavation or compaction as required.

"b) Dewatering

"c) Bracing and sheeting

"d) Sand or gravel fills

"e) Pipe trench excavation or backfill

"f) Tunnel excavation

"g) Top soil, sodding or seeding"

"4) Fill material for top of Reservoir, hauled from stockpile, per cu. yd. $1.05 (Unit Price)."

"It is understood and agreed that Geo. Sheaf & Co., Inc., retains the right to accomplish the pipe trench excavation by their own forces or by contract with oth-

been met, on cross sectioning as the method for determining quantity of top soil to be moved and placed, on 12,000 cubic yards being the quantity,[5] on the computations which entered into the amount of the judgment being correct, and on full performance and final acceptance as of May 1, 1957.

■ Generally, as to construction of ambiguous terms in a written contract, see headnote to Section 324, 17 C.J.S. Contracts, p. 751:[6]

"To the extent that a contract is susceptible of two constructions by reason of doubt or uncertainty as to the meaning of ambiguous language, it is to be construed most strongly or strictly against the party by whom, or in whose behalf, the contract was prepared or the ambiguous language was used, and liberally and most strongly in favor of the party who is not the author, and not responsible for the use, of the language giving rise to the doubt or uncertainty,"

a rule said to be:

"* * * peculiarly applicable where the contract is on a printed form prepared by one of the parties," same Section, p. 754.

■ Other supporting authority is Minnesota Amusement Company v. Larkin, 8 Cir., 299 F.2d 142 (1962), where the comment is made:

"* * * The contract as written is indefinite. It leaves doubt. The trial court, sitting without a jury, determined, first, that the contract here between the parties was ambiguous, and, second, that other evidence could be received from which the intent of the parties in entering into the agreement might properly be ascertained.",

in the court's reference in that case to the statement in United States v. Northern Pac. Ry. Company, 8 Cir., 188 F.2d 277 (1951), that: "* * * The question as to whether an ambiguity exists in a contract is to be determined by the court as a matter of law. 17 C.J.S., Contracts § 617 * * *", its reference to another statement in Floyd v. Ring Construction Corp., 8 Cir., 165 F.2d 125 (1948), cert. den. 334 U.S. 838, 68 S.Ct. 1496, 92 L.Ed. 1763, that: "The law is 'that the terms of a contract, if it be ambiguous, are matters of fact to be determined in the same manner as other facts; by the jury, if it be a jury case, or by the court, if the jury be waived; while the construction of the contract and its legal effect are questions of law for the court.' Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co., 8 Cir., 99 F.2d 902.", a further one: "It is the law, also, as the court observed in this case (66 F.Supp. 436, at page 438), that *where ambiguity exists in a contract the construction the*

---

ers. Surplus excavation from these operations will be deposited in general fill areas."

5. There is substantial evidence in the record from which the trial court could find that the parties during the latter part of November 1956 upon completion of the subgrades and prior to the commencement of the top soil hauling operations, entered into an oral agreement that the quantity of top soil to be taken from the borrow area and placed on the work site was to be determined by cross sectioning. That agreement was confirmed in a letter referred to in this record as plaintiff's Exhibit 2, dated November 21, 1956, on the stationery of the Eastmount Construction Company, directed to Transport and called to the attention of Miss Kay McAuliffe, referring to New Turkey Creek Pumping Station, Kansas City,

Missouri, signed by Eastmount Construction Company by its General Superintendent, G. L. Gessendorf, and insofar as it relates to that agreement is as follows: "As per your agreement with Mr. O'Marr we will cross-section the borrow area to arrive at the quantity of top soil placed."

That arrangement, if it is a modification of any provisions of the subcontract, seems to be covered under that clause which provides: "No modification of specified terms shall be binding unless in writing and signed by an authorized representative of Sheaf & Company".

6. The subcontract is a printed Geo. Sheaf & Company, Inc., form numbered 8530, with the typewritten parts thereof written in. The record as a whole permits an inference that it was prepared by the general contractor.

*parties in their dealings and by their conduct have placed upon the terms will furnish the court with persuasive evidence of their meaning.*", and this court's final comment in that case:

"It is our duty here on appeal to review such evidence as the court received in explanation of the ambiguity appearing in the contract between the parties. In consideration of such evidence, we must take that view thereof which tends to support the findings and conclusions of the trial court, in the same manner as we would consider such evidence as tending to support the verdict of a jury had a jury been sitting in this case and had it found in favor of the plaintiff. We must accept all inferences which reasonably tend to support the conclusions of the trial court. City of West Plains v. Loomis, 8 Cir., 1960, 279 F.2d 564, 567–568; United States v. Skolness, 8 Cir., 1960, 279 F.2d 350, 352–353."

Our reasons for holding the contract ambiguous are not altogether those of the trial court's, but as said in Campana Corporation v. Harrison, 7 Cir., 114 F.2d 400 (1940), the reviewing court is not compelled:

"* * * to give any specific weight to the trial court's conclusions of law, as it yet remains the duty of the appellate court to decide whether the correct rule of law has been applied to the facts found."

Interest additions to the judgment at the rate of 6% per annum from May 1, 1957 (the acceptance date of the subcontract) is the appellants' third and only other assignment of error.

The argument submitted in support thereof is to the effect that the parties honestly disagreed as to the amount of the "quantity of backfill" placed on the site under the subcontract; that the unpaid subcontract price for that reason could not be ascertained and interest therefor not to be allowed.

The general rule, 47 C.J.S. Interest § 19(b), p. 30, is the headnote to that section:

"In order to be liquidated so as to bear interest, a claim must be fixed and determined or readily determinable; but it is sufficient for this purpose if it is ascertainable by computation or a recognized standard. The existence of an unliquidated set-off or counterclaim against a fixed claim does not necessarily bar interest on the claim."

That rule is applied to a particular set of facts in Michelsen v. Penney, 2 Cir., 135 F.2d 409 (1943):

"Where the amount for which recovery is sought, even though not liquidated, is based upon the readily ascertainable value of services or property, the general and better considered rule is to allow interest, at least in the absence of strong equities to the contrary.",

as it is in Texas Company of Mexico, S. A. v. Roos, 5 Cir., 43 F.2d 1 (1930), cert. den. 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 794:

"Although the amount due is in dispute and is unliquidated, yet, if a claim represent a pecuniary loss which may be ascertained with reasonable certainty, interest should be allowed.",

and again in Johnson's Estate, 198 S.C. 526, 18 S.E.2d 450:

"Interest is allowable 'if the sum is certain or capable of being reduced to a certainty, from the time when, either by the agreement of the parties or the construction of law, the payment was demandable.' "

See also Lacy Mfg. Company v. Gold Crown Mining Company, 52 Cal.App.2d 568, 126 P.2d 644, footnote statement 47 C.J.S. Interest § 19, at p. 31:

"The fact that there is a dispute between the parties as to materials furnished, work done, or extras does not necessarily have the effect of rendering a demand unascertainable

by calculation so as to require a disallowance of interest.",

and Section 408.020, V.A.M.S. (R.S.Mo. 1949), which in part reads as follows:

"Creditors shall be allowed to receive interest at the rate of six per cent per annum, * * * for all moneys after they become due and payable, on written contracts * *."

The facts in the case, the general rules, the more specific ones evolved as indicated in the cited cases and the Missouri Statute, coupled with construction of the subcontract in accordance with the rules we have applied, impels the conclusion that the amount due as of the acceptance date was only a matter of $1.33 times 12,000 cubic yards. There was no error on the part of the trial court in holding as it did that interest should be allowed.

Affirmed.