The **AETNA CASUALTY AND SURETY COMPANY, Fireman's Fund Insurance Company, Hartford Accident and Indemnity Company, The Travelers Indemnity Company, United States Fidelity & Guaranty Company, Employers Reinsurance Corporation, Fidelity and Deposit Company of Maryland, General Insurance Company, and American Reinsurance Company, All Corporations, Appellants,**

v.

The **UNITED STATES of America for Use and Benefit of R. J. STUDER & SONS, H. C. Studer, and E. I. Studer Company, a Joint Venture, Appellees.**

No. 18193.

United States Court of Appeals
Eighth Circuit.

Sept. 23, 1966.

W. A. McCullen and Joseph M. Butler, Rapid City, S. D., for appellants, Bangs, McCullen, Butler & Foye, Rapid City, S. D., on the brief.

B. E. Longo, Billings, Mont., and George Beal, Rapid City, S. D., for appellees, Cooke, Moulton, Bellingham, Longo & Mather, Billings, Mont., and Bottum & Beal, Rapid City, S. D., on the brief.

Before JOHNSEN and BLACKMUN, Circuit Judges, and YOUNG, District Judge.

GORDON E. YOUNG, District Judge.

This is a Miller Act case.

Peter Kiewit Sons' Company, a corporation, hereinafter called Kiewit, was the prime contractor for the construction

of a Minuteman Missile Facility surrounding Ellsworth Air Force Base located near Rapid City, South Dakota. Kiewit's contract with the United States Government was for a consideration in excess of $56,000,000, and as described by the trial court in its findings, was a new, vast, and complicated undertaking extending over seven counties in western South Dakota with a perimeter of around four hundred miles.

In accordance with the requirements of the Miller Act (40 U.S.C. § 270a et seq.), Kiewit posted a bond which the appellants, who are bonding companies, signed as sureties. They are appellants here.

Kiewit subcontracted a portion of the work to Summit Construction Company, which, in turn, subcontracted a portion of its work to a joint venture consisting of R. J. Studer Sons, a Montana corporation, H. C. Studer, and E. I. Studer Company. The joint venture is the appellee.

During the course of performance Summit abandoned its work under its contract with Kiewit, resulting in the termination of Studer's contract with Summit. This action was instituted by Studer under the Miller Act for unpaid labor and materials against both Kiewit and the sureties. Kiewit was later dismissed as defendant, leaving the action only against the sureties.

The case was tried to the district judge without a jury.

The lower court found the issues in favor of Studer and entered judgment in its favor. Some of the items of cost claimed by Studer and allowed by the trial court are not questioned on this appeal. The issues raised by appellants on this appeal are as follows:

*Foreign Corporation Issue.* It is conceded that one of the members of the Studers' joint venture was a Montana corporation not qualified to do business in South Dakota. Appellants contend that under a certain statute of South Dakota the contract sued on by Studer is void and that Studer has no standing to bring this action.

*Additional Excavation Issue.* The parties are in dispute as to whether certain additional "scraper" excavation should be paid for at the rate of 40 cents per cubic yard as contended by appellants or $1.75 as contended by appellees.

*Labor Payments Issue.* The trial court allowed Studer reimbursement for all wages and subsistence payments actually paid by Studer during the course of its performance, which, in the case of the wages, was in excess of those rates which Studer had used in submitting its bid.

*Interest Issue.* Appellants question the trial court's allowance of pre-judgment interest from July 14, 1962, the date on which Summit terminated Studer's subcontract and which was the last date on which Studer performed any work.

We will discuss those issues in that order.

### Foreign Corporation Issue

Section 11.2103 of the South Dakota Code of 1939 reads as follows:

"Every contract made by or on behalf of any foreign corporation, subject to the provisions of this title affecting the personal liability thereof or relating to property within this state, before it shall have complied with the provisions of this title shall be wholly void on its behalf and on behalf of its assigns but it shall be enforceable against it or them."

Since it is conceded that at least one of the two corporations which were parties to the joint venture was a foreign corporation, appellants contend that this South Dakota statute forbids the enforcement of the contract on behalf of the joint venture.

■■ The district court rejected that contention, holding that the State of South Dakota could not by statute "condition the rights granted under the Miller Act." We think the district court was correct in so holding. In Clifford F. MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., 322 U.S.

102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163, the Court said, "The Miller Act, like the Heard Act, is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects."

■ And, in United States for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 216, 77 S.Ct. 793, 797, 1 L.Ed.2d 776, Mister Justice Burton, speaking for the Court, said:

> "The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of non federal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obligation of a defaulting contractor to his suppliers of labor and material."

In the case of Hoeppner Construction Co. v. United States for use of Mangum, 287 F.2d 108 (10th Cir. 1960), the plaintiff's subcontractor in a Miller Act case was a partnership which had not complied with the State of Colorado's filing requirements, which filing was a condition precedent to the bringing of any action on a contract according to Colorado statute.

The court rejected this as a defense urged by the surety, saying, at page 110:

> "But the right to maintain this action does not have its source in the law of Colorado. The right to institute and maintain the action in the United States District Court is expressly granted by the Miller Act. 40 U.S.C.A. § 270b. And the statutes of Colorado requiring the filing of the affidavit and withholding the right to prosecute an action for the collection of a debt until the affidavit has been filed do not condition or otherwise proscribe in any manner the right of the United States to institute and maintain in the United States Court for the use and benefit of a subcontractor an action against the prime contractor and the surety on the payment bond to recover a balance due for materials furnished and labor performed in pursuance of the subcontract."

■ United States of America for Use and Benefit of Bernadat v. Golden West Construction Company, 194 F.Supp. 371 (D.Utah 1961), a Miller Act case, involved a Utah statute similar to the one in effect in South Dakota. The district court rejected a similar defense urged by the United States, saying, at page 375: "Matters in defense of a Miller Act action seem within the protection of the doctrine that the right to bring such action may not be qualified by State law."

The same defense was raised by the surety in United States for Use of James F. O'Neil Company v. Malan Construction Corporation, 168 F.Supp. 255 (E.D.Tenn. 1958). The district judge in his opinion points out that under the Miller Act there is jurisdiction in the United States District Court and nowhere else. The plaintiff could not have brought the action in state court. He said:

> "The evils sought to be corrected by the decision in Erie v. Tompkins could not arise here since the suit could be brought in the federal court and nowhere else. The right created is distinctly a Federal right and, * * * any limitations imposed by the Tennessee courts with respect to the trial of the cases brought by foreign corporations illegally doing business in the state would be irrelevant."

Taking into consideration the remedial nature of the Act and the mandate of the Supreme Court to give it liberal construction and application, we think these cases reach the correct results.

■ Those state statutes which restrict the rights of noncomplying foreign corporations, although they may be enforced by the federal courts in diversity cases, should not and will not be enforced by the federal courts in Miller Act cases.

*The Claim for Additional Excavation*

Under date of August 1, 1961, Kiewit, as prime contractor, entered into a contract with the United States Corps of Engineers. Shortly thereafter Kiewit negotiated with Summit, Studer and other subcontractors concerning earthwork. Summit secured such a subcontract, but Studer did not.

On August 22, Studer commenced negotiations with Summit with a view to Studer's subcontracting part of the work which had been allowed to Summit. The latter furnished a list of required items of work to Studer and requested Studer to submit prices for such items. This was done, and appears in the record as Plaintiffs' Exhibit 38. One of the items on this list deals with this issue. It is Item 10-"Exc. at Silo −12′ to −32′, 220,000 (c.y.) at $1.75, $385,000.00."

These prices were satisfactory to Summit, and on August 23 the parties signed a letter contract wherein Studer agreed to perform the work listed on Plaintiffs' Exhibit 38 for the sum of $1,018,850. This letter appears in the record as Defendants' Exhibit 5. Although the items and quantities listed in Exhibit 38 appear in this letter, the unit prices—that is, the prices per yard—were omitted.

The parties obviously viewed the letter as preliminary in nature, for it contained the following: "The Studer Construction Company is to enter into a formal contract with the Summit Construction Company * * *"

Thereafter the parties entered into a formal contract. It bears the date of August 23, but according to the testimony it was not actually executed until September. This contract, Plaintiffs' Exhibit 35, provided that Studer would perform certain of the work which Summit had agreed to perform for Kiewit. The contract between Summit and Kiewit and the General and Special Conditions and the Specifications of the contract between Kiewit and the Corps of Engineers and Kiewit and Summit were incorporated by reference.

It provided that "open cut excavation" was to be performed on the basis of certain identified drawings of Kiewit. It also contained the following: "It is understood that this is a lump sum Contract and unit prices apply only to excess excavation performed by direction of Contractor. (Continued—See continuation sheet attached hereto.)"

On the sheet attached to the contract titled "Sheet No. 1" this appears:

"SECTION 2 OF PAGE 1:

"If conditions dictate additional initial excavation be performed in excess of that required by the Method II drawing, the Subcontractor will be reimbursed for such additional work as follows:

Excavation—.   .   .   $0.40 per CY—Bank Measurement.

"If the Subcontractor completes all work in accordance with the plans and specifications and the Contractor directs him to return to a Site to perform additional work, he will be reimbursed for such additional work in accordance with the following unit prices:

Excavation From 50–250 CY . . $2.00 per CY Bank Measurement.

Excavation Over 250 CY  . . . . 1.50 per CY Bank Measurement."

The original plans and specifications were altered, changing the lower level of −32′ to −32.48′, and the upper level of −12′ to −11.79′. This required additional excavation of yardage below −11.79, and the correct contract price per yard of this additional excavation forms the basis of this issue between the parties.

Appellees contend that the correct price is $1.75 per cubic yard; appellants say it is 40 cents.

Appellee did all of the excavation down to the −11.79 level by "scraper." None of the excavation by scraper is here involved. Below −11/79′ the excavation was by the "backhoe" method. It is undisputed that the backhoe method is much more expensive than by scraper, and in Plaintiffs' Exhibit 38, which contains the unit prices submitted by Studer to Summit, the price of scraper excavation was shown as 50 cents per cubic yard in contrast to $1.75 for the backhoe method. Later, in the formal written contract, additional initial excavation (scraper) was shown at 40 cents per cubic yard.

An official of Summit testified that generally backhoe excavation costs about four times as much as scraper excavation, and in Summit's bid to Kiewit it observed that ratio.

The trial district court's findings on the issue, in substance, were: The directive for excess excavation (over the amount provided for in the original specifications) from Kiewit to Summit and from it to Studer in the form of plans and drawings [Plaintiffs' Exhibits 37 (a)–37(g)] changing the elevations, resulting in an increase of 29,591.92 cubic yards; that the backhoe method was required for such additional excavation; that the unit price for such excavation as shown by unit prices upon which Studer bid was based (Plaintiffs' Exhibit 38) was $1.75 per yard; and that Studer was entitled to recover on that basis for the additional yardage.

We agree with the trial court's determination in this regard. Although Studer's contract with Summit was for a lump sum, the various instruments made provision for additional excavation. The unit prices submitted by Studer to Summit shortly before the letter contract were important to all parties for at least two reasons—first, the general conditions in the contract between Kiewit and the government (incorporated by reference in Studer's contract) required the contractor to furnish a detailed breakdown of lump sum prices for the purpose of estimating progress payments (Plaintiffs' Exhibit 41–SC–7); and second, to provide a basis for payment for additional units of work caused by changes in the plans which the parties knew were inevitable.

The provisions in the contract quoted above referring to excavation use three different categories: "excess excavation," "additional initial excavation," and "return excavation."

It is not contended that the excavation we are discussing here is "return excavation" as that term is defined. The question is, as the contract defines those terms, is it "additional initial" or "excess" excavation? The trial judge found it to be the latter.

There was never any controversy between Summit and Studer over this item. At the trial, Charles W. Rounds, president of Summit, testified that scraper excavation meant that done down to a −12′ level. In order of time this is the first excavation, and the term "additional initial excavation" refers to that done by scraper.

Owen Emme, assistant secretary-treasurer of Summit, drew the contract between Summit and Studer. His testimony corroborated that of Rounds and added that backhoe excavation costs about four times that done by scraper. Studer, who acted for the joint venture, testified to the same effect. In fact, there was no testimony to the contrary.

Thus, we have the principals of both parties to the contract in agreement as to the construction or meaning of the contract.

In Huffman v. Shevlin, 76 S.D. 84, 72 N.W.2d 852, 855, the Supreme Court of South Dakota said, "The construction given by the parties themselves to the contract as shown by their acts, if reasonable, will be accorded great weight and usually will be adopted by the court."

Appellants are incorrect when they urge that parol evidence was relied on by the trial judge to vary the terms of the written agreement. We think that under the contract this additional excavation is correctly characterized as "excess excavation performed by direction of con-

tractor," and as such should be paid for at the unit price of $1.75 per cubic yard.

### The Labor Payments Issue

The trial court included in the judgment awarded Studer $40,905.25 for increases in wages and subsistence payments paid by Studer. Of this amount, $21,472.25 represented increases in wage rates and $19,433.00 [1] increases in subsistence payments to employees over and above those contemplated in the contract. There appears to be no question that these payments were made by Studer.

Of these wage increases, Plaintiffs' Exhibit 45 indicates that over half of the amount in controversy was paid to members of the Operating Engineers Union.

Plaintiffs' Exhibit 49 indicates that the increase in subsistence payments was paid as follows:

| | |
|---|---|
| Operating Engineers | $14,408.50 |
| Teamsters | 4,987.00 |
| Laborers | 17.50 |

*Contract Provisions.*

The Special Conditions (Plaintiffs' Exhibit 41) of the contract provides:

"SC–9. RATES OF WAGES.

a. MINIMUM WAGES. The minimum wages to be paid laborers and mechanics on this project, as determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work and the pertinent locality, are attached hereto as pages WR–1 through WR–13."

The individual wage rates referred to were attached.

In the letter contract dated August 23, 1961 (Defendants' Exhibit 5), the last paragraph is as follows:

"If the pre-determined scale, as reflected in the bid documents, is revised by instructions or actions of the Government, then the Contractor will process a claim from the Subcontractor for the difference between the pre-determined scale on the contract, and such later revised pre-determinations."

There is no contention by appellees that the increased labor costs here involved are authorized by this portion of the letter agreement. Counsel say in their brief (page 58) that this letter refers only to claims forced upon the parties by the government and that "These increased costs imposed on Studer obviously do not come within that category."

### The Testimony.

Studer testified that at the time he was negotiating with Summit he understood that labor negotiations were then in process between a union and Kiewit; that he asked representatives of Kiewit whether Studer should anticipate the amount of any wage increase because of current negotiations, but he was told not to do so but to use the specification rates, " * * * if there would be any increase we would be reimbursed."

A day or two after Studer started to work, representatives of the Operating Engineers brought him a contract, which Studer refused to sign. Later, representatives of that union told him to either sign a new contract or they would shut him down. As a result of this threat he signed the proposed labor contract. At that time Summit had already signed a similar agreement.

He stated that he had an oral agreement with Summit at the time of the letter agreement (Defendants' Exhibit 5) that if Studer had to pay wage rates higher than used in Studer's estimate "in order to operate" he would be reimbursed for such extra cost. Rounds, the president of Summit, testified that he had no discussion with Studer concerning wage rates to be used other than those set out in the specifications. Mr. Emme, the assistant secretary-treasurer of Summit, said that when Summit moved its equipment in and sent men to start the work, they were confronted with a strike. La-

---

1. There is a discrepancy of $20 between this amount mentioned in the court's finding No. 5 and the amount shown in Plaintiffs' Exhibit 49 mentioned in the court's finding No. 11.

bor union members sat down in front of Summit's equipment, and threatened harm to Summit's men if they commenced work. These were members of the Union of Operating Engineers. The strike lasted two or three weeks and eventually Summit signed a contract with the striking union, but only after Kiewit had also signed such an agreement. Later Studer signed a similar contract. Emme's testimony as to his oral understanding with Studer is somewhat unsatisfactory. He says at one point that as he remembers his conversations with Studer he told him that Kiewit had promised to pay Summit any additional labor costs over and above those set forth in the specifications and that Summit would do the same thing for Studer. At another place he says, referring to the last paragraph in the letter agreement (Defendants' Exhibit 5) that his agreement was in accordance with that letter, that if wages were increased by reasons of actions of the government that Summit would process a claim of the subcontractor to Kiewit, and that he had no further discussions about increased labor costs thereafter.

Under date of September 16, 1961, Kiewit wrote a letter to Summit stating that Kiewit had reached an agreement with the operating engineers and the carpenters concerning work on the Rapid City Minuteman Project. The letter contains the following:

> "In accordance with the commitment made to you at the time you submitted your subcontract bid, we will, in the event you must, in order to get your work going, pay the rates for Operating Engineers contained in our Agreement with them (which rates are in accordance with the most recent Department of Labor wage predetermination for the project) reimburse you for the difference in cost between such rates and the rates upon which you based your bid (which are the present rates contained in the Agreement between Peter Kiewit Sons' Co. and the Operating Engineers covering work at Ellsworth Air Force Base)."

There is no similar reference to carpenters.

Under date of November 10, 1962, Kiewit wrote Summit. The opening sentence of that letter is: "Our letter of September 16, 1961, to your Mr. Rounds, confirmed our agreement to reimburse you for certain wage rate differentials between the wage rates used in your bid and the wage rates in our agreement with the Operating Engineers."

The letter went on to say that Kiewit's tabulation of the amount due as a result of this agreement as of the date of the letter was $16,795.69. The letter stated the wage differential for certain types of workers, both for Summit and Studer.

The agreement between Kiewit and the Teamsters Union (Plaintiffs' Exhibit 46) dated September 29, 1961, provided in Article II thereof, that:

> "ARTICLE II.
>
> "Scope & Term of Agreement.
>
> "This agreement shall apply to and cover all work performed by the Contractor under the contract for the construction of the Minuteman Facilities and all additions and changes in connection therewith and which is to be performed by the Contractor or any and all Subcontractors, including Specialty Subcontractors.
>
> "This Agreement, including and subject to the schedules attached hereto and made a part hereof, shall become effective upon execution by the parties hereto and shall remain in full force and effect until completion of construction of the Minuteman Facilities, Contract No. DA–04–548–ENG–55."

Under date of April 24, 1962, Kiewit wrote Summit as follows:

"Subject: Teamsters Agreement

"Gentlemen:

> "Effective this date, you are instructed to pay employees of yours on your subcontractors who come within the classification of teamsters the subsistence payments as required under the terms of the paragraph entitled "Subsistence" in Schedule A of the

agreement entered into between Peter Kiewit Sons' Co. and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America Local 749, a copy of which is enclosed for your guidance.

\* \* \* \* \* \*

"It is understood that the payment of such subsistence, in accordance with the above, shall be for our account. The amount or reimbursement to you shall be compiled from your certified payrolls.

"This directive covers only your employees who come within the classification of Teamsters."

In this connection, the trial court found:

"11.

"That Studer during the month of September 1961, in compliance with certain special terms and conditions of his subcontract [5], not to permit delays and in that connection not to allow demands for higher wages, strikes—actual and threatened—and pending labor disputes to hinder progress, was compelled to add increases in wages and subsistence to the workers, which from that time on until July 14, 1962, totaled $40,905.25, plaintiff's Exhibits 49 and 50."

In footnote 5 the trial judge cites Section 10 of Plaintiffs' Exhibit 35, which says in substance that it is understood that the work provided for in that agreement constitutes only a part of the overall work being performed by the contractor and other subcontractors and that the subcontractor (Studer in this case) agreed to perform the work called for in such a manner that he would not injure or damage any other work performed by the contractor or any other subcontractor. Also cited are the Special Conditions (Plaintiffs' Exhibit 41) of Studer's contract, Part II SC–1(d):

"d. COMPLETION OF WORK AS SCHEDULED. This project is an element of the Ballistic Missile Program. In the interest of national security, it is extremely important that contract completion dates are met. The Contractor's attention is directed to General Condition GC–5 'Progress Charts and Requirements for Overtime Work'. Multi-shift operations may be required on various work increments to meet the approved schedule of operation. In addition, the Contractor shall take steps necessary to avoid delays in the completion of the work. Such steps shall include, but not be limited to:

"(1) Measures which are necessary to permit working during all seasons of the year including adverse weather conditions.

"(2) Planning the procurement, ordering and delivery of materials in detail so that delays due to the nonreceipt of scheduled deliveries will be eliminated or minimized.

"(3) Scheduling and coordinating all operations including those of subcontractors to insure timely progress.

"(4) Providing additional working forces."

He also found in Finding No. 14:

"That the Kiewit operation under its prime contract was vast and complicated, extending as it did over several counties in western South Dakota, with a perimeter of several hundred miles involving structures, big and small, thousands of details and employment of hundreds of men skilled and otherwise. Time was of the essence, completion dates had to be observed, ordinary tolerances in view of the reasons for the Missiles were almost out, practical means for achieving of end results were the customs each day and seldom was there time for written covenants carefully phrased."

In Finding No. 15 the court said:

" \* \* \* Kiewit, in September 1961, after the subcontract had been made, under said subsection 'd(3)' exercising its prerogative 'to insure timely progress' by directives to all subcontractors for increases in wage and subsistence costs with the significant omission to assume those extras, as it had agreed during the negotiations. \* \*

Ostensibly unlimited under that language, are the powers of the prime contractor and arbitrary to the point of permitting increases beyond the scope of the written instrument. Hence, subject to the exception, with competency thus ascribed to the oral testimony, found sufficient, that Kiewit, Summit and Studer had agreed that he under his subcontract would be fully covered on the increases he now demands."

Appellants contend that the court's finding in respect to these wage payments is clearly erroneous: (1) Such finding is based upon incompetent evidence violative of the parol evidence rule and violative of the rule that all prior written instruments and negotiations are integrated into a written contract; and (2) Assuming, without conceding the competency of such evidence, the court's finding and conclusion is not supported by it.

■ The view this court takes makes it unnecessary to consider the application of the parol evidence rule for the reason that we have concluded that a finding that all wage payments in excess of those used in figuring Studer's bid were authorized or directed by Kiewit or Summit lacks support in the evidence.

There is no question but that certain increased wage differentials were authorized in writing by Kiewit relating to the operating engineers in its letters of September 16, 1961 (Exhibit 43), and November 10, 1962 (Plaintiffs' Exhibit 45). It is equally clear that Kiewit authorized subsistence payments to members of the Teamsters Union as shown by Kiewit's letter dated April 24, 1962 (Plaintiffs' Exhibit 44) and the contract between Kiewit and the Teamsters (Plaintiffs' Exhibit 46) dated September 29, 1961, which specifically provides that it shall apply to all work performed by the contractor and all subcontractors. A copy of this contract was enclosed in the April 24, 1962 letter from Kiewit to Summit. These additional wage payments having been specifically authorized in writing after the formal contract, there

can be no question of the application of the parol evidence rule.

Except for these additional wages paid the engineers and the subsistence payments to the teamsters, there is simply no evidence in the record that any other increases were authorized or directed by Kiewit or Summit "to insure timely progress" or for any other reason. Studer did not testify that any other increases in wage costs were authorized, nor, except for the teamsters and engineers, that any increased labor costs were imposed on Studer.

We, therefore, affirm the allowance of the increased wages paid the operating engineers and the subsistence payments to the teamsters, but we hold that to the extent other wage increases or subsistence payments are included in the amount of $40,905.25 referred to in the trial court's Finding No. 11, we must reverse.

### Interest Issue

The trial court allowed pre-judgment interest from July 14, 1962 on the amount awarded Studer. That court found that Summit ended its contract with Studer on that date without fault on the part of Studer and that the factors for calculating the amount due Studer were available to Studer and Summit on that date.

Section 37.1711 of the South Dakota Code 1960 Supp. reads as follows:

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt."

■ This court in Eastmount Construction Company v. Transport Manufacturing and Equipment Co., 301 F.2d 34 (1962), in discussing the general rule as to the allowance of interest, quoted with approval the following language from Michelsen v. Penney, 135 F.2d 409 (2d Cir. 1943), "Where the amount for

which recovery is sought, even though not liquidated, is based upon the readily ascertainable value of services or property, the general and better considered rule is to allow interest, at least in the absence of strong equities to the contrary."

South Dakota appears to follow the general rule. In Beka v. Lithium Corporation of America, ⁰77 S.D. 370, 92 N.W.2d 156 (1958), which involved a suit over breach of contract involving a number of disputed items, the South Dakota court affirmed the allowance of interest, and in construing § 37.1711 of the South Dakota Code set forth above, said:

> "The mere fact that the claim is disputed does not defeat the allowance of interest * * * interest is allowable on damages if there exists established or reasonably ascertainable market prices or values of the subject matter by reference to which the amount due may be determined by computation. This rule seems to be generally accepted. * * * The reason for denying interest on a claim is that where the person liable does not know what sum he owes, he cannot be in default for not paying. When the exact sum of the indebtedness is known or can be readily ascertained the reason for the denial of interest does not exist."

There were a number of items which entered into the judgment awarded Studer below that were not in dispute between the parties. As to the items which are in dispute, they could have been readily ascertained on the date mentioned by the trial court. There was no dispute as to the amount of yardage involved in the backhoe excavation—the only dispute was whether this yardage should be multiplied by 40 cents or $1.75. There was no dispute as to the amounts paid to employees who belonged to the Teamsters Union or the Union of Operating Engineers as the result of increased labor costs. The only question was whether or not those increased costs were due under the contract.

The bonding companies cannot now say that they had no independent means of ascertaining these correct amounts. The criterion is, could the amounts have been ascertained by Summit?

 We agree with the trial court that interest was properly allowed on the amount due Studer from July 14, 1962, when its contract was terminated.

## CONCLUSION

We cannot from the record ascertain with sufficient definiteness the amounts in dollars for additional wage and subsistence payments which we have held were properly recoverable by Studer. For that reason the cause is remanded so that the trial court may make specific findings as to the amounts recoverable by Studer for additional wage and subsistence payments in accordance with this opinion; otherwise, the trial court's decision is in all things affirmed.