UNITED STATES of America for Use of PRITCHARD PRODUCTS CORPORATION, Appellee,

v.

FULLERTON CONSTRUCTION COMPANY and Continental Casualty Company, Appellants.

No. 12430.

United States Court of Appeals Fourth Circuit.

Argued Oct. 29, 1968.

Decided March 5, 1969.

Michael H. Quinn, Columbia, S. C. (W. Ray Berry, and Fulmer, Barnes, Berry & Austin, Columbia, S. C., on brief) for appellants.

W. Croft Jennings, Jr., Columbia, S. C. (John W. Thomas, and Roberts, Jennings & Thomas, Columbia, S. C., on brief) for appellee.

Before SOBELOFF, BRYAN and WINTER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

In this Miller Act case, 40 U.S.C. §§ 270a–270b, general contractor Fullerton

Construction Company would offset against what it had agreed to pay Pritchard Products Corporation under a subcontract of April 1965, the amount Fullerton lost due to the alleged fault of Pritchard during the construction of a central heating and refrigeration plant for the United States at Fort Jackson, South Carolina. Hindered by the penury of the presentation, the District Court decreed for the sub. However, despite this inexcusable obscurity, we must hold that the general's counterclaim should have been allowed.

The prime contract required the erection of five prefabricated cooling towers upon concrete basins or bases. The subcontractor undertook to install the towers, but the basins were to be provided by the general contractor. Twin towers would be placed on each of two basins, and a fifth tower on a single basin, but this litigation does not directly touch upon this last basin.

In accordance with concededly acceptable trade practice, the subcontractor submitted to the general and to the United States, plans and drawings for the basins. Efficient operation of the towers was guaranteed by the sub, and their success demanded the availability of sufficient air for induction into the tower louvers for use in the cooling process. A serious consideration, therefore, was the avoidance of any obstruction, including other towers, of air flow to the louvers. The dominant question in this case is whether the basins built by the general contractor conformed to the plans and drawings of the subcontractor.

For guidance in positioning the basins, the general contractor had only the site plan furnished by the Government and the plans and drawings supplied by the subcontractor. All of these documents were parts of the subcontract. The site plan was only a schematic layout of the entire plant, which did not purport to be precise in fixing the shapes or dimensions of the basins or their locations in relation to the other plant buildings.

On the site plan the basins were drawn as almost square, lying side by side, north and south, with their east sides towards the central buildings of the plant. The louvered walls of the twin-towers would be on the east and west sides of the basins. In this delineation, the louvers of one tower would not be exposed to those of the nearby tower.

On the sub's design, however, the basins were oblong or domino shaped. The louvered walls were in the longer dimensions. The record does not indicate just how the sub intended the basins to be laid out. It is not clear whether the basins would lie lengthwise, end to end, in tandem north and south, or lengthwise, east and west, but side by side. In the first way the dominos would extend north and south, one behind the other; in the second way each domino would extend east and west beside the other. If the first, no louver would confront another. In the latter, one louvered (the long) side of each tower would face north and the other south, and the basins would have a common air space between them.

In the sub's design the only call for distance between the basins appears as No. 12 of "Important Notes" on the subcontractor's drawings, in these words:

12—1'-6" Min Erection Clearance Required At Face "B" & "D", 8'-0" "B" Tower, 12'-0" "R" Tower, Min Clearance At Face "A" & "C" For Free Air Flow.

Translated, since only R towers are in controversy, this notation indicates that a 12-foot minimum erection clearance is required at faces A and C for free air. These faces are the louvered, opposing and longer sides of the sub's domino structure.

As completed by the general, the basins were not in accord with the exactions of note 12, the subcontractor averred. It so advised the general and, in addition, stated that consequently it would not guarantee satisfactory performance of the towers to be erected on them.

When completed, the basins were side by side, 12 feet apart, with the ends of the domino headed east and west. The louvers were on the north and south sides, instead of on the east and west sides as the site plan provided. Hence, under the general's pattern the louvers on one side of each basin were adverse. On that account, the sub contended, not 12 but only 6 feet of free air flow would be afforded to each of these openings. Separation of 24 feet was a prerequisite under note 12, the sub asserted, i. e., 12 feet for *each* of the vis-a-vis air intakes.

As the Government would not accept this work without the sub's guarantee, the general was obliged to destroy the second basin and rebuild it 24 feet away from the first. The cost was the amount for which the general has here counterclaimed against the subcontract price.

The general says that the notation on the sub's drawings meant only that the *basins* should be 12 feet apart, as it placed them, that the reference to free air flow was solely to supply the *reason* for the interval, and that the stipulation did not prescribe 12 feet of free air for *each* adjacent set of twin towers. The argument is that if the note for 12 feet of room did not specify all the air the towers needed, the fault was the sub's miscalculation, and it alone should respond for the cost of the removal and reestablishment of the basin.

■ We agree with the general contractor. To be kept in mind throughout is that the sub's drawings and plans were the sub's instructions to the general. It, of course, had the responsibility for explicit and clear directions; if they were vague or otherwise uncertain, the sub failed in its obligation. Further, if the 12-foot specification did not embrace adequate air area, it was not the general's but the sub's mistake. For all the general knew, each louver may have demanded only 6 feet, the 12 feet to be divided between louvers.

■ At the very least, the note has been proved ambiguous. Testimony of engineers experienced in construing building specifications and called as experts upon the intendment of the note, was just about in counterpoise. In these circumstances the note must be rigidly read against its scrivener, the sub. Bennett v. United States, 178 Ct.Cl. 61, 371 F.2d 859, 861 (1967); Eastmount Const. Co. v. Transport Mfg. & Equip. Co., 301 F.2d 34, 41 (8 Cir. 1962). On this reading we cannot say that the contention of the sub should prevail.

There was no objection to the proximity of the basins until after their construction. General's installation was rejected solely because the sub would not vouch, on this layout, for the towers' accomplishment of their purpose. The Government was entitled to this covenant, but could look only to the general for it. Therefore, the Government's insistence upon the relocation did not imply that it deemed the general to blame.

The District Judge thought note 12 required 12 feet of free air expanse for each set of twin towers—24 feet between basins. However, he did not decide against the general on this determination alone. With it he intertwined his conviction that the general had disposed the basins contrary to the site plans. He saw no difficulty in comprehending and applying note 12 if the basins were oriented—in place—relative to each other and to the central buildings according to the site plan. He found that by this plan, as we concluded, supra, the louvered walls were to be on the west and east sides of the basins. Thus, when in a north-south line the basins would not have countering or competing louvers. On its failure to provide a 24-foot detachment, the District Judge held that the general was in the wrong and chargeable with the correction expense.

The answer is, however, that the sub's drawings did not allow conformance with the site plan. As designed by sub, to repeat, the basins were oblong rather than square according to the site plan. This dictated a basin alignment different from that plan for two reasons.

First, the uncontradicted testimony of the Government's resident engineer was to the effect that to arrange the basins in tandem, north and south, would have extended the basin occupancies beyond the available Government land.

The second reason for the general's departure from the site plan in positioning the basins was the situation of the sump. On the site plan, a sump for the handling of water to and from the towers was located at the east side of the basins, that is between them and the central buildings and connecting the basins and the buildings. The record is unfortunately lacking in explicating the sump and its purpose. It was described simply as "a depression formed in the one end of the concrete foundation to provide access for the equipment, and water service coming into the cooling towers, and also to provide drainage." Evidently, it was mandatory that the sump be as close to the central buildings as possible, "to conserve the amount of pipe run necessary to service the cooling tower."

Under the sub's basin design, however, the sump could not be kept on the east side of the basins, as the site plan contemplated, unless the louvered sides of the basins engaged each other aerially. This was because the sub's prefabricated towers were constructed with the sump on the non-louvered end of the domino, while the site plan depicted it on a louvered side. It was impossible, then, because of this inconsistency, to orient the basins as designed by the sub, so as to accord with the site plan.

As an independent ground of decision, the District Judge found that the sub during construction had warned the general contractor of the danger of stationing the second basin only 12 feet from the first, and that the general was negligent in not heeding the warning. The caution is said to have arisen from a similar building project then in progress at Fort Gordon, Georgia, slightly in advance of the one at Fort Jackson. The Fort Gordon structure was not under the general contractor here, but the sub was the same in both instances. Upon discovering that the basins at Fort Gordon had been set too close together to permit the proper air flow, the sub said it moved at once to prevent this problem at Fort Jackson. The sub contends that immediately its foreman telephoned the general to beware of this danger.

Review of the record convinces us that the Court's finding of a timely forewarning of the general here is untenable. The undisputed testimony is that the second basin was nearing completion when the word reached the general's project manager at Fort Jackson sometime in or prior to June 1965. At the very least, the excavation and the steel reinforcement had then been finished. Proof of the tenor and opportuneness of the telephone message is not so definite as to fix it as a prompt and adequate admonition for avoidance of error at Fort Jackson, or even to put the general on inquiry before going ahead with the second basin.

■ By the decree now on appeal the cost of removing and rebuilding the second basin is put at $5,339.96. As mentioned earlier, the District Court refused to allow the general this amount in reduction of the sub's claim for payment of the subcontract figure. The balance had, by consent, been ordered paid to the sub. We think the general should be credited with the disputed item. An attorney's fee was awarded counsel for the sub in the sum of $1,000. We find no warrant in the Miller Act or the law of South Carolina for this assessment. The judgment of the trial court must be vacated, with directions to the Court to disallow any recovery by the sub of the general contractor in this case.

Reversed.